**David Vancortlandt CROSBY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 05–83–01201–CR, 05–83–01202–CR.**

Court of Appeals of Texas, Dallas.

June 11, 1985.

Rehearing Denied Sept. 18, 1985.

H. Jay Ethington and Thomas D. Glenn, Dallas, for appellant.

Donald G. Davis, Dallas, for appellee.

## ON MOTION FOR REHEARING EN BANC

GUILLOT, Justice.

Appellant, David Vancortlandt Crosby appeals a conviction for unlawful possession of a controlled substance, cocaine, and for unlawfully carrying a handgun in a tavern. Appellant was sentenced to a term of five years imprisonment on the cocaine charge, and three years imprisonment, to run concurrently, on the weapon charge. In two grounds of error, appellant urges the trial court erred in overruling his motion to suppress the fruits of an alleged illegal search and seizure. We overrule both grounds and affirm.

Appellant had contracted with Cardi's, a club licensed to sell alcoholic beverages by the Texas Alcohol Beverage Commission, to perform a musical concert on April 12, 1982. At approximately 11:45 p.m. on that evening, Dallas Police Officers Rinebarger and Holly arrived in the parking lot of Cardi's to provide backup assistance to other officers who had responded to a call regarding a man who would not leave the club. After assuring themselves that everything was under control, Rinebarger and Holly decided to go inside the bar to make a routine inspection for liquor law violations pursuant to the Texas Alcoholic Beverage Code. TEX.ALCO.BEV.CODE ANN. ("T.A.B.C.") § 101.04 (Vernon 1978).

While inspecting the premises, Rinebarger and Holly walked through the customer area of the club toward the stage. Appellant had taken a break and was not performing at this time. Wanting to look out over the entire club, Rinebarger stepped up onto the stage. Once Rinebarger got on the stage, a man standing by a curtain drawn across a doorway put his fist in Rinebarger's chest, shoved him back, and said, "You can't go in there." Rinebarger pushed the man aside and entered the dressing room where he saw appellant with a propane torch in one hand, a glass pipe in the other, and an unzipped athletic bag on his lap. When Rinebarger looked

inside the unzipped bag, he found a baggie containing a white powdery substance which was later determined to be cocaine. Rinebarger arrested appellant, zipped the bag closed, and took the bag, torch, pipe, and Crosby to Dallas City Hall. While waiting to ride the elevator up to the jail, Rinebarger noticed that the athletic bag he had confiscated from appellant felt unusually heavy. Consequently, he searched the bag and found a .45 Colt automatic revolver, the weapon forming the basis of the second charge.

■ In his first ground of error, appellant contends that the trial court erred in overruling his motion to suppress evidence of items found in his possession as a result of an inspection authorized by the Texas Alcoholic Beverage Code ("T.A.B.C."). Specifically, appellant urges that the room in which he was arrested was "his enclosed, private dressing room," and that the owner of the club had given him "exclusive use of the dressing room." On this basis, appellant contends that Officer Rinebarger's action in entering his dressing room was beyond the scope of the inspection authorized by T.A.B.C. § 101.04 and that, in the absence of a search warrant, consent, or probable cause, the search was unreasonable under the Fourth Amendment to the United States Constitution and Article 1, § 9 of the Texas Constitution.

T.A.B.C. § 101.04 authorizes administrative inspections on premises that sell alcoholic beverages. Section 101.04, T.A.B.C. provides:

> By accepting a license or permit, the holder consents that the commission, an authorized representative, or a peace officer may enter the premises at any time to conduct an investigation or inspect the premises for the purpose of performing any duty imposed by this Code.

The Code further provides that no licensee may possess a narcotic or any equipment used or designated for the administering of a narcotic *nor may he permit a person on the premises to do so.* TEX.ALCO.BEV. CODE ANN. § 104.01(9) (Vernon Supp. 1984).

T.A.B.C. § 11.49(b)(1) provides the sole means for exempting any portion of a premises from the "licensed premises" and, subsequently, from the waiver of rights required by T.A.B.C. § 101.04. T.A.B.C. § 11.49(b)(1) provides:

> *Subject to the approval of the commission or the administrator,* and except as provided in Subsection (c) of this section, an applicant for a permit or license may designate a portion of the grounds, buildings, vehicles, and appurtenances to be excluded from the licensed premises. If such a designation has been made and approved as to the holder of a license or permit authorizing the sale of alcoholic beverages at retail or as to a private club registration permit, the sharing of space, employees, business facilities, and services with another business entity (including the permittee's lessor, which, if a corporation, may be a domestic or foreign corporation, but excluding a business entity holding any type of winery permit, a manufacturer's license, or a general, local, or branch distributor's license), does not constitute a subterfuge or surrender of exclusive control in violation of Section 109.53 of this code or the use or display of the license for the benefit of another in violation of Subdivision (15) of Subsection (a) of Section 61.71 of this code. This subsection shall not apply to original or renewal package store permits, wine only package store permits, local distributor's permits, or any type of wholesaler's permits.

TEX.ALCO.BEV.CODE ANN., § 11.-49(b)(1) (Vernon Supp.1984). The facts clearly show that the dressing room used by appellant was not designated to be excluded from the licensed premises. The dressing room was, therefore, under Cardi's exclusive occupancy and control and, by law, Cardi's could not surrender that control or occupancy to appellant. This is clear from section 109.53 of the T.A.B.C. which provides, *inter alia,*

> Every permittee shall have and maintain exclusive occupancy and control of the entire licensed premises in every phase

of the storage, distribution, possession, and transportation and sale of all alcoholic beverages purchased, stored, or sold on the licensed premises. Any device, scheme, or plan which surrenders control of the employees, premises or business of the permittee to persons other than the permittee shall be unlawful.

TEX.ALCO.BEV.CODE ANN., § 109.53 (Vernon Supp.1984). By accepting its permit, Cardi's consented to allowing peace officers to enter the dressing room at any time to investigate or inspect the premises for the purpose of performing any duty required by the Code. T.A.B.C. § 101.04 (Vernon 1978).

The statutory law outlined above, when applied to the facts of the instant case, shows that the management of Cardi's could not have intended to provide any part of their premises to appellant free from the constraints of their permit. Moreover, the facts show Cardi's did not intend to provide the dressing room free from such constraints. Although Douglas Harris, the General Manager and Director of Marketing and Public Relations of Cardi's, testified that as part of the contractual relationship with appellant, Cardi's was obligated to provide "a private dressing room away from the public," he further stated, "I would not presume to keep a peace officer out of any office in any Cardi's in any city ..." The entire cross-examination of John Denton, the manager of Cardi's, supports the contention that the management of Cardi's had not surrendered control of the premises or any part thereof at the time of this offense. The cross-examination of Denton follows:

Q. Mr. Denton, now, surely, it wasn't your understanding that Mr. Crosby was to be free from having peace officers going back and performing their appointed rounds there in the dressing room, was it?

A. No, sir.

Q. You are not telling the court that it was any part of your understanding that a police officer couldn't go back there, are you?

A. No, sir.

Q. O.K. I mean, after all, that's part of your agreement in being licensed to sell alcoholic beverages is to follow the alcoholic beverage code which says that police officers can in fact check for liquor law violations and narcotic violations anywhere on the premises. Is that not correct?

A. Yes, sir.

It is clear that Cardi's intended to exclude the *public* from appellant's dressing room and that his right of privacy extended only to keeping the public out.

Appellant may have been mistaken in his belief that the dressing room was not involved in the liquor operation of the establishment and that the owner gave him exclusive use of the dressing room. But this mistaken belief does not establish a reasonable expectation of privacy. *Almanza v. State*, 365 S.W.2d 360, 362 (Tex.Crim.App. 1963). Even if the Cardi's management had intended to exclude appellant's dressing room from the provisions of T.A.B.C., such a contractual provision could not have been effective because the law will not enforce an agreement to do that which the same law says will not be done. *Shell Oil Company v. Stansbury*, 401 S.W.2d 623, 630 (Tex.Civ.App.—Beaumont 1966, writ ref'd n.r.e.). Any rights of privacy asserted by appellant must have derived from Cardi's. Consequently, these rights are subject to the same strictures as Cardi's, pursuant to the terms of the T.A.B.C. We hold that appellant's expectation of privacy was neither reasonable nor legitimate.

The same argument raised by appellant was rejected by the Texas Court of Criminal Appeals in *Clark v. State*, 445 S.W.2d 516 (Tex.Crim.App.1969). In *Clark*, a police officer went to Clark's liquor store for the sole purpose of conducting a search for stolen goods. After entering the retail section of the building, which was open for business, he went along a hall to a room with a locked door and forced the door open. Therein he found the stolen goods. The officer testified that he did not attempt to secure a search warrant although he had

ample opportunity to do so; that no violations of the liquor law had been reported to him and; that he did not go to the store to search for liquor law violations, nor did he find any.

In *Clark*, although the locked room was not open to the public and the search was not conducted for violations of the state liquor laws, the Court of Criminal Appeals held that the warrantless search was authorized by the statute governing the licensing of establishments that sell alcoholic beverages. *Clark*, 445 S.W.2d at 520. The right to claim that the product of a search conducted in a locked room on the premises was waived because it was not shown that the searched room had been designated to be excluded from the licensed premises. *Clark*, 445 S.W.2d at 520.

When the facts of the instant case, that the appellant was not in a room which had been excluded from the licensed premises and that the search was for violations of the state liquor law, are considered in light of the waiver contained in T.A.B.C. § 101.-04, it becomes clear that the entry and inspection of Crosby's dressing room by Officer Rinebarger was authorized by the Texas Alcoholic Beverage Code. Consequently, we hold that the trial court properly overruled appellant's motion to suppress evidence of items found in his possession as a result of Officer Rinebarger's inspection.

■ In his second ground of error, appellant contends that the athletic bag seized from his dressing room at Cardi's was unlawfully opened and searched in the basement of Dallas City Hall in violation of the Fourth Amendment to the United States Constitution and article 1 § 9 of the Texas Constitution. He relies upon *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1977), to support his position.

In the case of *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), the appellant had been in possession of a shoulder bag when lawfully arrested. Without obtaining a warrant and in the process of booking him and inventorying his possessions, the police removed the contents of the shoulder bag and found amphetamine pills. On the basis of the pills found in the bag, the appellant was subsequently charged with possession of a controlled substance. Appellant relied upon *Chadwick*, 433 U.S. at 1, 97 S.Ct. at 2476, *Sanders*, 442 U.S. at 753, 99 S.Ct. at 2586, to support his assertion that a warrant was required to lawfully search the bag. Rejecting that reliance, the Supreme Court recognized that at the police station, it is entirely proper for the police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. *Lafayette*, 103 S.Ct. at 2609. The rationale of *Lafayette*, that every consideration of orderly police administration benefiting both police and the public pointed toward the appropriateness of examining the appellant's shoulder bag prior to incarceration, applies to the instant case. *See Nash v. State*, 682 S.W.2d 338 (Tex.App.—Dallas 1984, no writ).

The fact that Rinebarger opened appellant's bag in the elevator while on the way to the book-in area, rather than moments later at the book-in area, is of no consequence. The constitutional prohibition of unreasonable searches and seizures does not apply to authorized police inventory procedures. *Lafayette*, 462 U.S. at 640, 103 S.Ct. at 2606. When a person is initially placed in jail, neither a warrant nor probable cause is required for a valid inventory search. *Lafayette*, 462 U.S. at 640, 103 S.Ct. at 2606, *Nash*, 682 S.W.2d at 339. Examining all the items removed from the arrestee's person and listing them is justified as a reasonable administrative procedure to protect the police against false claims and to protect the arrestee against theft of property in police custody. *Nash*, 682 S.W.2d at 339. These interest, according to *Lafayette*, 462 U.S. at 640, 103 S.Ct. at 2606, outweigh the arrestee's privacy interest in the contents of the property removed. *Nash*, 682 S.W.2d at 339. Consequently, the court will not second

guess the police as to whether less intrusive methods might have been adequate. *Nash,* 682 S.W.2d at 339.

Because it is entirely proper for police to inventory property found on an arrestee's person, *Lafayette,* 462 U.S. at 640, 103 S.Ct. at 2606, the gun in appellant's athletic bag would have been inevitably discovered. Consequently, appellant has not been harmed by having his bag searched on the way to the book-in area. While the Court of Criminal Appeals has not adopted the terminology "doctrine of inevitable discovery," it has adopted the rationale of this doctrine. *See Santiago v. State,* 444 S.W.2d 758 (Tex.Crim.App.1969); *Johnson v. State,* 496 S.W.2d 72 (Tex.Crim.App. 1973); *Wyatt v. State,* 566 S.W.2d 597 (Tex.Crim.App.1978) and *Miller v. State of Texas,* 667 S.W.2d 773 (Tex.Crim.App.1984).

█ The fact that it was necessary to unzip the athletic bag in order to discover the gun is likewise of no consequence. When Officer Rinebarger seized the bag, it was open and the contraband was in plain view. Rinebarger, himself, closed and zipped the bag preparatory to transporting appellant to jail. Furthermore, the bag was continuously in Rinebarger's possession from the time of arrest to the time of search. In *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983), the Supreme Court held that the subsequent opening of a container, which had been found to contain illicit drugs, was not a "search" within the intendment of the Fourth Amendment. That case involved a customs search of a container and its subsequent resealing and "controlled delivery" to the designated recipient. The container, of necessity, left the eyesight of the undercover officers for a period of time. The reasoning of *Andreas* should apply even more strongly to a case such as ours wherein the bag was closed by a police officer, kept in his possession, and subsequently reopened by him. In *Andreas,* the Supreme Court said:

> It is obvious that the privacy interest in the contents of a container diminishes with respect to a container that law enforcement authorities have already lawfully opened and found to contain illicit drugs. No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal. The simple act of resealing the container to enable the police to make a controlled delivery does not operate to revise or restore the lawfully invaded privacy rights.

\* \* \* \* \* \*

> The plain view doctrine is grounded in the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy. That rationale applies here; once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost. Consequently, the subsequent reopening of the container is not a "search" within the intendment of the Fourth Amendment.

\* \* \* \* \* \*

> A workable, objective standard that limits the risk of intrusion on legitimate privacy interests is whether there is a substantial likelihood that the contents of the container have been changed during the gap in surveillance. We hold that absent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority.

*Andreas,* at 103 S.Ct. 3323–3325. In the instant case, there was absolutely no likelihood that the contents of appellant's athletic bag had been changed during the gap in surveillance; consequently, no "legitimate expectation of privacy" had attached to the appellant's athletic bag when it was searched in the elevator.

No error being shown, both grounds of error are overruled. The judgment of the trial court is affirmed.

CARVER, SPARLING and MALONEY, JJ., join in this opinion.

WHITHAM, J., concurs with an opinion in which ALLEN, VANCE and McCLUNG, JJ., join.

STEPHENS, J., concurs with an opinion.

HOWELL, J., dissents with an opinion in which GUITTARD, C.J., and AKIN and DEVANY, JJ., join.

WHITHAM, Justice, concurring.

I concur in the result. I differ with the majority's disposition of this appeal. I write to express my views concerning appellant's motion to suppress the cocaine. In my view, TEX.ALCO.BEV.CODE ANN. § 101.04 (Vernon 1978) must be considered in light of the "pervasively regulated business" exception to the warrant requirement found in *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) and *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1971). The majority fails to discuss these cases or the exception to the warrant requirement. *Colonnade* involved, as does the present case, laws regulating the alcohol beverage industry. Consequently, I cannot agree with the majority's reasoning in overruling appellant's first ground of error. In my view, the present case must be decided in light of the Supreme Court's holding in *Colonnade*. I concur, therefore, that appellant's first ground of error must be overruled, but for reasons much different from those relied upon by the majority.

Before setting forth these reasons, I comment upon an aspect of the majority's opinion which concerns me. The majority's broad language, particularly its reliance upon *Clark v. State*, 445 S.W.2d 516 (Tex. Crim.App.1969), troubles me. I cannot agree with the implication I read in the majority's opinion that section 101.04 permits a licensee to waive fourth amendment rights of the licensee's customers and employees. If a licensee's customers and employees on the licensed premises can be searched without warrant, consent or prob-

able cause for a purpose totally unrelated to enforcement of the Texas Alcoholic Beverage Code, then the majority's opinion poses a serious threat to fourth amendment rights. See dissenting opinion by Judge Onion in *Clark*, 445 S.W.2d at 521. Furthermore, *Colonnade* follows *Clark* by one year and in my view renders *Clark* doubtful, if not meaningless, authority to support the majority's holding in the present case.

That concern expressed, I return to *Colonnade*. To my mind, *Colonnade* cannot be ignored. Given the Supreme Court's holding in *Colonnade*, section 101.04 cannot have the compelling effect on appellant's fourth amendment rights attributed to this statute by the majority.

Section 101.04 provides:

By accepting a license or permit, the holder consents that the commission, an authorized representative, or a peace officer may enter the premises at any time to conduct an investigation or inspect the premises for the purpose of performing any duty imposed by this Code.

The licensee's coerced "consent" in section 101.04 must be considered in light of the historical development of the regulation of the sale of liquor in the Anglo-American legal system. In *Colonnade*, the Supreme Court summarized the historical background, both in this country and in England, of strict governmental scrutiny of places that sell liquor to the public. As put by the Supreme Court:

The Government, emphasizing that the Fourth Amendment bans only "unreasonable searches and seizures," relies heavily on the long history of the regulation of the liquor industry during pre-Fourth Amendment days, first in England and later in the American Colonies. It is pointed out, for example, that in 1660 the precursor of modern-day liquor legislation was enacted in England which allowed commissioners to enter, on demand, brewing houses at all times for inspection. Massachusetts had a similar law in 1692. And in 1791, the year in which the Fourth Amendment was rati-

fied, Congress imposed an excise tax on imported distilled spirits and on liquor distilled here, under which law federal officers had broad powers to inspect distilling premises and the premises of the importer without a warrant. *Colonnade,* 397 U.S. at 77, 90 S.Ct. at 777. Thus, the "consent" statutorily extracted from the licensee by section 101.04 is but a present day attempt to allow the State to enter "pervasively regulated business" premises at any time without a warrant. Put another way, section 101.04 is the Texas way of updating the English legislation of 1660 permitting "commissioners to enter, on demand, brewing houses at all times for inspection." Therefore, this court must decide the present case in light of *Colonnade.*

In *Colonnade,* the Supreme Court agreed that legislative bodies, in that instance Congress, have broad power to design such powers of inspection under the liquor laws as deemed necessary to meet the evils at hand. *Colonnade* at 76, 90 S.Ct. at 776. The Supreme Court, however, placed a limitation on powers of inspection. That limitation is clear. The legislative body must make rules governing the procedure that inspectors must follow. In the absence of such rules, the Supreme Court was explicit. Where Congress has authorized inspection but made no rules governing the procedure that inspectors must follow, the fourth amendment and its various restrictive rules apply. *Colonnade,* 397 U.S. at 77, 90 S.Ct. at 777. Therefore, we must look to the Texas Alcoholic Beverage Code to find if the legislature made rules governing the procedure that inspectors must follow. If no rules exist, the fourth amendment and its various restrictive rules apply in the present case. I find no such rules in the Texas Alcoholic Beverage Code governing the inspection undertaken by Officer Rinebarger. Thus, we have a much different situation in the present case than in *Biswell* in which "[e]ach licensee is annually furnished with a revised compilation of ordinances that describe his obligations and define the inspector's authority. 18 U.S.C. § 921(a)(19). The dealer is not left to wonder about the purposes of the inspector or the limits of his task." 406 U.S. at 316. Consequently, in my view, the fourth amendment and its various restrictive rules *could* apply in the present case. In order to determine if the fourth amendment and its various restrictive rules *do* apply, we must first determine whether appellant had a reasonable expectation of privacy. To make that determination, we must consider *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and its progeny, particularly *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

Consistently with *Katz,* the Supreme Court uniformly has held that the application of the fourth amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. *Smith v. Maryland,* 442 U.S. at 740, 99 S.Ct. at 2580. The inquiry normally embraces two distinct questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," *i.e.,* the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable'," *i.e.,* whether the individual's expectation, viewed objectively, is "justifiable" under the circumstances. 442 U.S. at 741, 99 S.Ct. at 2581.

### The Searched Area

The fourth amendment protects people, not places. *Katz,* 389 U.S. at 351–52, 88 S.Ct. at 511. Addressing the inquiry, however, requires a more detailed description of the scene than made by the majority. Photographs and a diagram in evidence show a raised stage adjacent to the dance floor. The searched area is a small room offstage to a performer's right as he faces the audience. A person on stage enters the room through a framed doorway wide enough to allow one person easy passage

between stage and room. The doorway is the only means to enter or exit the room. There is no door in the doorway. Instead, a movable curtain of a single piece of fabric is suspended from a rod near the top of the doorway. When the curtain is positioned so as to cover the passageway, it appears possible for patrons in front of the stage to see under and around the curtain. When the curtain is pulled aside, an off-stage view is presented. The room is the only "backstage" or "offstage" area of the nightclub. From the photographs, the only identifiable property in the room is a matching stuffed sofa and chair. The record is otherwise silent as to what other furniture, fixtures or conveniences were in the room. With that description, I return to the inquiry posed by *Smith v. Maryland*, 442 U.S. at 740, 99 S.Ct. at 2580.

### The First Part of the Inquiry

The question is whether appellant has shown that he seeks to preserve something as private. I invite the reader to consider what transpired during the course of the hearing on appellant's motion to suppress. In his brief, appellant tells us that the searched area was "his enclosed, private dressing room" and that "the owner gave him exclusive use of the dressing room." Appellant argues that, therefore, he had a reasonable expectation of privacy in his "dressing room" which was protected by the fourth amendment. As shown below, however, appellant by his own motion made during the suppression hearing caused to be stricken from the record all his testimony that would prove that the searched area was his "enclosed, private dressing room."

Appellant testified at the hearing on his motion to suppress, but not at trial. During cross-examination, appellant invoked the fifth amendment. Appellant thereafter moved "the Court respectfully to allow us to withdraw [appellant] as a witness in these proceedings and have his testimony then not considered by the Court except for the limited purposes of establishing a reasonable expectation of privacy." The trial court granted the motion to the extent

"that [appellant] be allowed to stand down and not be subjected to any further questions." The trial court, however, made the further ruling that:

[B]ut the Court is going to strike [appellant's] testimony from the record and not consider it for any purpose in this hearing, that being his privilege as I see it. So, I will grant [appellant's] motion in that regard.

Appellant made no objection to any part of the trial court's ruling on his motion, including the ruling striking "his testimony from the record and not considering it for any purpose in this hearing." Consequently, the record contains no testimony from appellant that would support a finding that the searched area was appellant's "enclosed, private dressing room."

Therefore, I look to see if testimony of other witnesses would support a finding that the searched area was appellant's "enclosed, private dressing room." The contract between Cardi's and appellant is not in evidence. Cardi's general manager and director of marketing and public relations testified that, as a part of the contractual relationship with appellant, Cardi's was obligated to provide "a private dressing room *away from the public*." (emphasis added). In my view, there is an important distinction, however, between a sanctuary provided to provide appellant an escape from nightclub patrons, *i.e.*, the public, and a room constitutionally protected from intrusion by police officers without warrant, consent or probable cause. Indeed, Cardi's local manager testified that it was *not* his understanding "that [appellant] was to be free from having peace officers going back and performing their appointed rounds there in the dressing room."

Next, consider the other persons in the room where appellant was arrested and the man at the doorway who said to Officer Rinebarger "[y]ou can't go in there." There were five or six other persons in the room, in addition to appellant, when Officer Rinebarger entered. The record is silent as to who these persons were or by what right they were in the room. Thus, these

persons could have been members of the appellant's band, Cardi's employees, Cardi's customers, or other members of the public. Without appellant's stricken testimony, the record does not tell us how appellant came to enjoy fourth amendment rights by being present in the searched area. Absent appellant's stricken testimony, we have not a clue suggesting appellant had acquired some individual right of privacy to possess cocaine in a small room just offstage; crammed, as it must have been, with five or six unidentified and unexplained persons.

As to the man at the doorway, Cardi's local manager testified that the man was employed by appellant and was at the doorway for purposes of "security." Officer Rinebarger testified that the man first identified himself as appellant's bodyguard and later as appellant's bass player. Otherwise, the record is silent as to the man's duties and instructions. We do know, however, from the testimony of Cardi's local manager that it was *not* the manager's understanding "that [appellant] was to be free from having peace officers going back and performing their appointed rounds there in the dressing room." In my view, this testimony of Cardi's local manager negates any implication from leading questions put to Cardi's employees and to police officers that the room was a "private dressing room" in the sense that appellant enjoyed a fourth amendment right of privacy in the room. Therefore, the record tells us only that a security-bodyguard-bass player employed by appellant did not want officer Rinebarger to enter the room, and that appellant had no right in Cardi's to be free from police intrusion into the room. Consequently, on this record, I conclude that the presence of the man at the doorway does not support appellant's assertion of an individual right of privacy in the room.

Moreover, I conclude that there is yet another reason why appellant has failed to show that he seeks to preserve something as private. I reach this conclusion because the cocaine in appellant's possession was exposed to the public and, therefore, without a privacy interest. I refer to the presence of the five or six unidentified and unexplained persons in the room when Officer Rinebarger entered. Importantly, appellant failed to establish that these persons were not members of the public. The fourth amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of fourth amendment protection. *Katz v. United States*, 389 U.S. 347, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). On this record, therefore, I can only conclude that appellant exposed his cocaine to the public.

Therefore, the first part of the inquiry identified in *Smith v. Maryland*, 422 U.S. at 740, 99 S.Ct. at 2580, must be answered in the negative for two reasons. First, appellant failed to prove that he exhibited an actual subjective expectation of privacy in the searched area. Second, by exposing his cocaine to the public, appellant failed to show that he seeks to preserve something as private.

### The Second Part of the Inquiry

Next, I considered the second part of the inquiry posed in *Smith v. Maryland*, 442 U.S. at 740, 99 S.Ct. at 2580. The question is whether appellant's expectation, viewed objectively, is justifiable under the circumstances. Other than to indicate that appellant was publicly commencing the ingestion of cocaine, the record is silent as to what actual use appellant made of the room. From the testimony and the photographs, it is obvious that appellant exited the stage, sat down on the floor of the room just inside the doorway and opened his bag. Appellant sat on the floor with his back to the doorway. Thus, in my view, appellant was not found in possession of cocaine in his private dressing room. Rather, appellant was found in possession of cocaine while seated on the floor of the offstage area of the nightclub just past the stage exit. To my mind, the searched area was not a backstage individual dressing room with a star painted on the door as appellant would have us believe. Instead, the

searched area on this record was no more than a part of the nightclub premises in which appellant and five or six unidentified and unexplained persons had gathered. Therefore, as I view the evidence, appellant was found in possession of cocaine by Officer Rinebarger in a public place; not a private place. Thus, even if appellant did harbor some subjective expectation that the room offstage would remain private, this expectation is not one that society is prepared to recognize as reasonable under the facts of the present case. Accordingly, the second part of the inquiry identified in *Smith v. Maryland,* 422 U.S. at 740, 99 S.Ct. at 2580, must be answered in the negative.

For the above reasons, appellant failed to meet his burden of showing a reasonable expectation of privacy in the searched area. Accordingly, the fourth amendment and its various restrictive rules do not apply. *Colonnade,* 397 U.S. at 77, 90 S.Ct. at 777. Therefore, the trial court did not err in denying appellant's motion to suppress the cocaine on fourth amendment grounds.

### Article 1, § 9 of the Constitution of the State of Texas

I now consider appellant's challenge to the search under the Constitution of the State of Texas. Although the majority ignores appellant's challenge to the search under article 1, section 9, I would hold that the search did not violate appellant's rights under this State's constitution. I would do so because our court of criminal appeals in a reasonable expectation of privacy case has identified the fourth amendment and article 1, section 9, as identical safeguards. The basic purpose of the fourth amendment and article 1, section 9, is to safeguard the privacy of individuals from arbitrary invasions by governmental intrusions. Thus, the fourth amendment and article 1, section 9, protect people and not places. *Green v. State,* 566 S.W.2d 578, 582 (Tex. Crim.App.1978) (en banc). Consequently, in deciding appellant's challenge under article 1, section 9, it must first be determined if appellant had a reasonable expectation of

privacy. Since the basic purpose of both constitutions is to safeguard the privacy of individuals from arbitrary invasion by governmental intrusions and since the court of criminal appeals has identified the two constitutional provisions as identical safeguards in a reasonable expectation of privacy case, I conclude that in the present case that article 1, section 9, of the Constitution of Texas affords appellant no greater protection against searches than that provided by the fourth amendment. Therefore, having concluded that appellant had no reasonable expectation of privacy in determining whether the fourth amendment and its restrictive rules apply, I likewise conclude that appellant had no reasonable expectation of privacy in determining whether article 1, section 9, and its restrictive rules apply. Thus, I would hold that the Constitution of Texas affords appellant no protection in the present case. Accordingly, the trial court did not err in denying appellant's motion to suppress the cocaine under article 1, section 9, of the Constitution of Texas.

For the above reasons I would overrule appellant's first ground of error. Although I do not agree with the majority's reasoning, I agree that appellant's second ground of error, complaining of seizure of the weapon, should be overruled. Accordingly, I concur that the judgment of the trial court must be affirmed.

ALLEN, VANCE and McCLUNG, JJ., join in this concurring opinion.

STEPHENS, Justice, concurring.

I concur in the result reached by the majority; however, I do not believe the majority's opinion accurately states why appellant could not have a reasonable expectation of privacy in this instance.

The Texas Alcoholic Beverage Code provides that:

By accepting a license or permit, the holder consents that the commission, an authorized representative, *or a peace officer may enter the premises at any time to conduct an investigation or inspect the premises for the purpose of*

*performing any duty imposed by this Code.*

TEX.ALCO.BEV.CODE ANN. § 101.04 (Vernon 1978) (emphasis added). It further provides that:

Every permittee shall have and maintain exclusive occupancy and control of the entire licensed premises in every phase of the storage, distribution, possession, and transportation and sale of all alcoholic beverages purchased, stored or sold on the licensed premises. *Any device, scheme or plan which surrenders control of the employees, premises or business of the permittee to persons other than the permittee shall be unlawful.*

TEX.ALCO.BEV.CODE ANN. § 109.53 (Vernon Supp.1985) (emphasis added). Every adult person who is not incompetent is presumed to know the law. *Morris v. Reaves,* 580 S.W.2d 891 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ); *see also Bryant v. O'Donnell,* 359 S.W.2d 281 (Tex.Civ.App.—Dallas 1982, no writ). Further, it is conclusively presumed that parties to a contract, having knowledge of the law, contract with reference to it. *Gulf Oil Corp. v. Southland Royalty Co.,* 478 S.W.2d 583 (Tex.Civ.App.—El Paso 1972), *aff'd on other grounds,* 496 S.W.2d 547 (Tex.1973); *Calvert v. Adams,* 388 S.W.2d 742 (Tex.Civ.App.—Austin) *rev'd on other grounds,* 396 S.W.2d 948 (Tex.1965); *Lange v. Shulte,* 276 S.W.2d 889 (Tex.Civ. App.—Amarillo 1954, writ ref'd n.r.e.).

Since appellant is presumed to have known the law at the time he entered into his agreement with Cardi's, he could not have had a reasonable expectation of privacy with respect to the inspection of his dressing room by peace officers for two reasons. First, if it was his intention to enter into a contract which would give him complete control of the dressing room, including the right to prevent its inspection by peace officers, then he is presumed to know that such a contract would be unlawful and void. Second, if it was his intention to enter into a contract giving him the private use of the dressing room with limited or restricted access, he is presumed to

have known that such a limitation could not be extended to the inspection of the room by peace officers. In either case he is presumed to have known that peace officers might have entered the room, and having this knowledge, appellant could not have had a reasonable expectation of privacy. Accordingly, I agree that the conviction must be affirmed.

HOWELL, Justice, dissenting.

In this dissent, I write to dispel any inference that the Texas Alcoholic Beverage Code is the Supreme Law of the Land. Although I cannot agree with the opinion authored by Justice Whitham, I am more concerned with the opinions of my learned colleagues Justices Guillot and Stephens. Granted, the latter opinions on their face contain considerable logic and force, but the implications thereof, in this writer's opinion, pose a significant threat to Fourth Amendment freedoms.

The Guillot opinion appears to take a mechanistic or real property approach to the search and seizure questions presented. The Alcoholic Beverage Commission is considered to possess rights in the nature of an easement in gross, granting to law enforcement officers unlimited rights of ingress and egress. The opinion states that Cardi's *could not have intended* to grant a reasonable expectation of privacy to appellant because Cardi's had no power to restrict the authorities in the exercise of their dominant estate. It is submitted that such analysis begs the real question: *What representations were actually made?* Obviously, if Cardi's violated the terms of their license in dealing with appellant, the remedy is not to be found in the forfeiture of appellant's rights under the Constitution.

The opinions in this case reiterate that the Fourth Amendment protects people, not places, but the interpretations of that expression obviously vary. It is submitted that the focus of inquiry in each instance must be whether the defendant exhibited a subjective expectation of privacy and whether that expectation is one which society is prepared to accept. *Katz v. United*

*States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Smith v. Maryland*, 442 U.S. 735 (1979). Inquiries into what the management of the nightclub *could have intended* simply do not meet the constitutionally mandated approach.

My colleague Justice Whitham has questioned the continued vitality of *Clark v. State*, 445 S.W.2d 516 (Tex.Crim.App.1969) upon which the Guillot opinion is built. That question is here bypassed because *Clark* is clearly distinguishable. Clark was the actual holder of the alcoholic beverage permit in question. Appellant Crosby was not the license holder. The user of licensed premises, whether he be entertainer, employee, patron, casual visitor, or whoever, stands in an entirely different posture than the actual licensee. It does little violence to the Fourth Amendment to hold that the licensee voluntarily and knowingly committed his premises to the strictures of the Alcoholic Beverage Code in order to obtain the special privileges that enure to that license. If we hold that users of the premises are also bound, then we necessarily find the waiver of constitutional rights by proxy, a wholly unacceptable proposition.

Bear in mind the declaration of the Supreme Court that, while those freedoms guaranteed by the Bill of Rights can be waived, a knowing and voluntary act is required, *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), and "high standards" of proof are required of those who would assert any such waiver. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

It is to be noted that in *Clark* the stolen goods were located in a room that was physically separate and some distance removed from the portion of the premises devoted to the sale of alcohol. However, as noted by the Guillot opinion, the Code defines the licensed premises in the broadest possible terms and *Clark* upheld that definition to its full extent. If *Clark* is applied to all users of licensed premises, as

defined in the Code, the implications are enormous.

Many hotels have alcohol licenses and serve those beverages in and adjacent to the lobby. Has every guest in a one thousand room hotel engaged in "the waiver of rights required by T.A.B.C. § 101.04" merely by checking into a hotel licensed to sell alcohol, so that the guest's room and baggage can be indiscriminately searched, even without his presence or knowledge? Of course, the wise and foreseeing might demand before they register that the management document that guest rooms have been exempted from the Code, but is this a realistic approach to such gross potential incursions upon the Fourth Amendment?

In *Clark*, the court also upheld the officer's act of breaking into a locked room. In the writer's view, there are a number of entertainers and performers who travel from city to city for the purpose of appearing in bars, lounges, and night clubs. Every entertainer needs a dressing room, not only for clothing and make-up purposes, but so that between performances he might have a few moments of relaxation away from the eyes and demands of the audience. It is though not to be uncommon for entertainers to meet this need by taking their dressing rooms with them in the form of a trailer or mobile home. The vehicle will be moved onto the licensee's real property, probably less than ten feet from a side or rear door, so that the vehicle can be connected to the utilities and so that the performer can dash to his dressing room with minimal exposure to the elements. Had appellant Crosby availed himself ·of such an arrangement and had Officer Rinebarger become curious, or even suspicious, of what appellant and his five or six unidentified companions were doing in that vehicle, would the Code justify Officer Rinebarger in breaking the lock on the door and in conducting a "no knock" raid? Or, would the Code justify forcing open the door while appellant Crosby was onstage and absent for the random purpose of conducting a minute search for whatever contraband might be uncovered?

We are also informed that Officer Rinebarger came to Cardi's parking lot to assist with a disturbance. The language of the Code is broad enough to include the parking lot as a part of the licensed premises. Are we to understand that having handled the disturbance call, the Code would have authorized Officer Rinebarger to commence breaking into the patron's automobiles (using no more force than necessary, of course) and conducting searches unsupported by probable cause?

There is more. The Guillot opinion relies on a shoulder bag search, *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). At the conclusion of his forcible search of the patrons' autos, would the Code have allowed Officer Rinebarger to proceed inside and seize and empty out the contents of all the shoulder bags and handbags of the female patrons, employees and visitors? Could he then have forcibly inspected every pocket of every male within the premises?

To ask these questions is to answer them. Furthermore, to the thinking of this writer, to ask these questions is to expose serious flaws in the opinion of the Honorable Justice Guillot.

Neither am I able to accept the separate concurring opinion of my colleague Justice Stephens. This writer presents that the "presumption" that every man knows the law, relied upon in such opinion, is no presumption at all. Neither is it a rule of evidence nor a proposition of procedural law. In reality, it is neither more nor less than a substantive declaration that those who do not know the law are equally punishable with those who do. It is only a restatement of the ancient maxim, *Ignorantia juris non excusat.* The principle is an absolute necessity to the enforcement of the criminal law, else the courts be crowded with persons claiming lack of knowledge that casting litter on the public street is an offense, along with those having the temerity to profess lack of awareness that murder is forbidden by the Penal Code. Inasmuch as lack of knowledge that the conduct charged was unlawful is no defense, declarations of ignorance are properly excluded from evidence, just as all irrelevant matters are excluded.

The "presumption" in question undoubtedly prevents appellant from attempting to defend on grounds that he did not know cocaine to be a proscribed controlled substance. However, it cannot be invoked to burden him, as a user of a licensee's premises, with constructive notice that the licensee has waived, not only on behalf of himself, the licensee, but on behalf of all who might frequent the premises, the protections of the Fourth Amendment. The high constitutional standards under which we live forbid any such approach. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628 (1966).

Additionally, if appellant is to be "presumed" to know the law, he is *presumed* to know the provisions of the Fourth Amendment, is *presumed* to know the constitutional standards for the waiver thereof, is *presumed* to know which is the higher law, and is *presumed* to know which preempts the other. Thusly stated, the constructive notice theory, espoused in the Stephens opinion, reduces to an avoidance of the ultimate question that must be decided if affirmance is to be bottomed upon the Alcoholic Beverage Code: *With respect to this particular defendant and the peculiar facts of this case, are the Code provisions a constitutionally acceptable restriction upon Fourth Amendment freedoms otherwise available?* It is submitted that the question must be answered in the negative and that the Constitution must prevail.

Concerning the able opinion of the Honorable Justice Whitham, it is misleading as to where the burden of proof lies. Whenever a warrantless search has been conducted, the burden is on the State to show that the same was constitutionally reasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970); *Koonce v. State*, 651 S.W.2d 46, 47–48 (Tex.App.—Dallas 1983, no pet.).

It would further appear that no inferences can be drawn from appellant's refusal to submit to cross-examination. The trial court was fully justified in striking out the entirety of his testimony. *Keller v. State,* 662 S.W.2d 362 (Tex.Crim.App.1984). We cannot speculate whether the trial court could have properly ruled that the right against self-incrimination had been waived, because the trial court allowed him to withdraw his testimony and return to the *status quo ante.* Thus, we must consider the case as if appellant never offered his testimony.

Neither can any inferences be taken in favor of the State when a defendant fails to offer his own testimony at a suppression hearing. It is uncommon for a defendant to do so because, in such cases, cross-examination can be withering, particularly under Texas rules of wide-open cross-examination.

In addition, I cannot agree that the opinion of the Honorable Justice Whitham has accurately analyzed the facts in five aspects:

(1) The curtain did totally cover the doorway. A photograph in evidence reflects that, while it did not quite touch the floor when closed, it did preclude a view into the room as effectively as a door of steel. Neither Officer Rinebarger nor any patrons in front of the stage nor anyone else could see under or around the curtain. Any view into the room was further obscured by the positioning of the "man at the doorway." Officer Rinebarger conceded that he could not see anything that was happening within the room except by opening the curtain.

(2) According to John Denton, the manager at Cardi's, the name of the man at the door who attempted to prevent Officer Rinebarger's entry was "Tony. I don't know what his last name was." Asked if he was "your employee or Mr. Crosby's," Denton

replied, "Mr. Crosby's." "What was his purpose for being there at the front part of the dressing room area? Security?" Answer: "Yes." Officer Rinebarger testified: "First, [the man at the door] told me he was Mr. Crosby's bodyguard.... [T]hen he later told me he was his bass player." Asked if the man could have been both, Rinebarger replied, "Yes."

Until the contrary be shown, an employee found in the service of his employer is presumably doing the employer's bidding. It follows that the man at the door was following appellant's instructions and that by stationing the man there, appellant was attempting to exclude unwanted persons— specifically including Officer Rinebarger. The record cannot be plainer. It was appellant who had caused the curtain to be closed and who had stationed his bodyguard outside to physically obstruct the doorway when a uniformed officer approached and who had caused the bodyguard to call out " 'You can't go in there.' " It would appear that this fully answers "the first part of the inquiry ... whether appellant has shown that he seeks to preserve something as private" (quoting Whitham opinion).

(3) Although the record contains no testimony from appellant, it does contain testimony that would support a finding that the room in question was appellant's "enclosed, private dressing room." Both Manager Denton and Douglas Harris, apparently Denton's superior, testified that Cardi's had agreed to provide appellant with a private dressing room and, from a diagram of the premises, identified the room in which appellant was arrested as the dressing room that was so provided.[1] Officer Rinebarger, who had made rounds in the club "hundreds" of times and had been in every part of it, testified that this particular room was the only space provided to entertainers

---

1. Douglas Harris, identifying himself as the general manager and director of marketing and public relations of Cardi's, testified that the dressing room was specifically designed to seclude that area from the general public. He further testified that, as part of the contractual relationship with Crosby, Cardi's was obligated to provide "a private dressing room away from the public." Manager Denton testified: "Nobody from the public was allowed back in the dressing room. We had security people outside the dressing room door to make sure nobody was allowed inside."

for rest and relaxation. Officer Holly, who assisted in the arrest, conceded that the room was "a dressing room or intermission room ... not open to the general patrons."

Of course, the identity of the room as a *dressing* room is not the focal point of the inquiry; the true question being tripartite: whether appellant, with the consent of the owner, tenant, or other person with greater right of control, was attempting to exercise custody or control of the particular room; whether he exhibited an expectation of privacy; and whether society is prepared to accept that expectation as reasonable.

The sentry at the door reflects that appellant did have custody of the room and was attempting to control ingress and egress. Inasmuch as the State had the burden to show the search reasonable, we cannot presume in the State's behalf that appellant's acts to control ingress and egress were without the owner's consent— uncontested possession raises a presumption to the contrary.

(4) Manager Denton's testimony that "it was *not* his understanding that [appellant] was to be free from having peace officers going back and performing their appointed rounds *there in the dressing room*," is highly significant in one respect. It operates as direct evidence that this room was, in fact, the agreed private dressing room. On the other hand, I cannot accept my colleague's interpretation of this testimony. There is no evidence whatever that this "understanding" was ever communicated to appellant. Had he been directly notified by management that the police would routinely come through the room in question, a different picture might be presented. Without express notice, the uncommunicated "understanding" or intent of management is without significance.

(5) Neither is the number of persons found within this room material so long as the group was not large enough to support a conclusion that the room had been thrown open to the public in general. While "the record is silent" as to the identity of the other persons in the particular room, that fact does not satisfy the State's burden to show a constitutionally reasonable search. The most likely deduction is that they were members of the band or other fellow entertainers. When Officer Rinebarger entered, one of them said, "David, put it down, put it down, David," indicating that the speaker was personally acquainted with appellant. From the photographs and testimony it appears that the members of the group were all facing one another at fairly close intervals, indicating that they were conversing and partaking of one another's company. The circumstances infer that they were there by invitation of appellant, or, at least, with his consent. Even if someone was only a patron when he arrived on the premises, he became a special invitee and no longer a member of the public in general when he took his seat in that room. Wherever a person may be situated, should he perform an act before six total strangers, it might be concluded that the actor has not exhibited the essential subjective expectation of privacy. However, one does not surrender his privacy by admitting his confidants into a room. The State, having the burden, made no showing that those present in appellant Crosby's dressing room were such a diverse and unacquainted group that acts performed in front of them were without expectation of privacy.

———

There is a plethora of search and seizure cases. The particular facts of each case must be carefully analyzed; a slight difference can produce the opposite outcome. There are few cases defining the rights of an incidental user (as opposed to the owner or operator) of pervasively regulated commercial premises such as this. The two most illustrative cases are *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) and *Buchanan v. State,* 471 S.W.2d 401 (Tex.Crim.App.1971).

In *Ybarra,* a warrant was issued to search a tavern premises and to personally search the bartender on the basis of an affidavit that the bartender would, on the date in question, be selling heroin. While executing the warrant, the officers frisked

all patrons happening to be present, some nine to thirteen in number, and found heroin in Ybarra's pocket. The Supreme Court held that the mere presence of unimplicated patrons would not justify the expansion of the search to their persons. *Ybarra*, 444 U.S. at 90, 100 S.Ct. at 341. It further refused to apply an Illinois statute authorizing officers executing a warrant to search others present for weapons or for possession of anything described in the warrant. Held, the statute cannot come into play until the officers validly entertain an articulable reason to believe that another person present but not named in the warrant possesses weapons or contraband.

[A] search ... of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.

Each patron who walked into the Aurora Tap Tavern ... was clothed with constitutional protection against an unreasonable search ... separate and distinct from the ... protection possessed by the proprietor.... [T]he search warrant ... gave ... no authority whatever to invade the constitutional protections possessed individually by the tavern's customers.

444 U.S. at 91–92, 100 S.Ct. at 342 (citations and footnote omitted).

It is conceded, arguendo, that the Alcoholic Beverage Code authorized Officer Rinebarger's presence within Cardi's night club and authorized all the searches that he desired against the licensee. However, it is submitted that the Code can no more be applied against appellant than could the Illinois "frisk everyone present" statute be applied against Ybarra.

Restating the matter in a different light, the purpose of the Illinois statute was to protect officers from attack while executing a warrant and to prevent concealment of the evidence specified in the warrant. The purpose of the Code is to facilitate the detection of liquor law violations. In either instance, the Fourth Amendment protects third persons, such as Ybarra and appellant Crosby, from operation of the respective statutes *against them* until the officer comes to possess an articulable reason to believe that expansion of the search *against them* is necessary.

The often stated proposition that the Fourth Amendment protects persons, not places, must again be emphasized. *Clark v. State*, 445 S.W.2d 516 (Tex.Crim.App. 1969), might be construed as holding the Alcoholic Beverage Code equivalent to a perpetual search warrant against a licensee. Nevertheless, *Ybarra* requires that Officer Rinebarger must have been possessed of an articulable reason to believe that a violation of the Alcoholic Beverage Code was occurring behind the curtain before he was authorized to thrust aside the sentry, push open the curtain, and invade appellant Crosby's expectation of privacy.

At the time of the arrest, Officer Rinebarger was merely making his customary rounds. He appeared to believe that the mere status of the premises as an alcoholic licensee warranted his actions. He stated: "I believe ... I had a right to search and look for the use of illegal drugs." He conceded that he did not know what he was looking for when he entered appellant's dressing room. He testified that he was curious; he had a "hunch" that a violation of the law may have been in progress in the dressing room. The officer further admitted that, in the myriad of times that he had inspected Cardi's for liquor law violations, he had never observed a violation in the dressing room. Nor did he have any indication that there may have been one occurring in the dressing room on the night of the arrest in question. When asked, "[W]hat went on in your thinking along with your instincts that would cause you to believe that there was liquor law violations in the stage area or the dressing room area," he testified, "There was none."

In sum, he could articulate no reason to believe that opening the curtain would disclose any liquor law violation. Whether or not that which he saw in the exercise of his "hunch" might have been used against the licensee is not the question. *Ybarra* clearly teaches: a hunch is not a sufficient constitutional basis to cause a search, lawfully commenced against one person, to be extended to other persons whose only relationship to the search is propinquity. The protection is "separate and distinct" from that which is "possessed by the proprietor."

*Buchanan* was an appeal of two convictions. On separate occasions Buchanan entered commode stalls of men's restrooms, first in a Sears department store and later in a city park, and, in each instance, committed oral sodomy with another person. Buchanan was observed by police officers "from concealed positions above" the respective restrooms. One of the convictions was reversed because the conduct took place behind a locked commode stall door; whereas, the no-door-on-the-stall case was affirmed.

> What people seek to preserve as private, even in areas accessible to the public, may be constitutionally protected as the Fourth Amendment protects people, not places. A toilet stall in a public restroom is private to the extent it is offered to the public for private, however transient, individual use. The occupants are entitled to the modicum of privacy its design affords.... A person inside ... a stall with the door locked could be said to have some reasonable expectation of privacy.... [W]hile the method of the alleged clandestine surveillance was identical in each instance, the appellant's ex-

pectation of privacy ... was not reasonable where no doors were provided....

471 S.W.2d at 404 (citations omitted).

My colleagues lay emphasis on the proposition that Cardi's had no understanding that the police would be excluded from any part of the premises. *Buchanan* would indicate that such uncommunicated intent or understanding of the proprietor is irrelevant inasmuch as the officer in *Buchanan* hardly could have occupied a concealed position "above the men's restroom" at Sears without management's knowledge and assent. Analogizing further, the *Guillot* opinion would indicate that if Sears had possessed an alcoholic beverage permit, *Buchanan* would have been bound by the constructive consent provisions of the Alcoholic Beverage Code even if the officer had no express consent from Sears for his "clandestine surveillance."[2] However, it defies logic to hold that constructive consent has greater weight against the Fourth Amendment than express consent. The principle of "persons, not places" dictates that, inasmuch as it was appellant's expectation of privacy which was invaded, the reasonableness of the search must be determined from his viewpoint—what he reasonably could have expected.

The cocaine conviction should be reversed and the fruits of the illegal search suppressed. Inasmuch as the gun was discovered during the course of an arrest without probable cause, suppression should also be granted in the latter case. *See, Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). I would reverse both convictions with instructions to enter judgment of acquittal.

GUITTARD, C.J., and AKIN and DEVANY, JJ., join in the dissent.

---

2. Assume that the public restroom at Cardi's was constructed the same as the Sears restroom in *Buchanan*. Assume that, rather than consume cocaine in his dressing room, appellant Crosby did so in a commode stall in that restroom with the door latched. If he were apprehended as the result of *Buchanan*-type clandestine surveillance, could the conviction be upheld on strength of the Alcoholic Beverage Code

and the *Clark* decision? Could an affirmance be grounded on the proposition that appellant is presumed to know the inspection provisions of the Code? Could it be held that appellant in entering the stall and closing the door had not sufficiently shown that he sought to preserve something as private? In short, how is *Buchanan* to be distinguished from the present case?