**David VanCourtlandt
CROSBY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 1128–85, 1129–85.**

Court of Criminal Appeals of Texas,
En Banc.

Nov. 12, 1987.

Certiorari Denied June 13, 1988.

See 108 S.Ct. 2821.

H. Jay Ethington, Thomas D. Glenn, Dallas, Fred C. McDaniel, DeSoto, Gerald A. Banks, Dallas, for appellant.

Henry Wade, Former Dist. Atty., and John Bance, Dist. Atty., and Donald G. Davis and Knox Fitzpatrick, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

DUNCAN, Judge.

The appellant, David VanCortlandt Crosby, was convicted of unlawful possession of a controlled substance, cocaine (Cause No. F–82–85707–JL), as proscribed by the Texas Controlled Substances Act, Art. 4476–15 § 4.04(a) and unlawfully carrying a handgun in a tavern (Cause No. F–82–85678–NL) as proscribed by Texas Penal Code, § 46.02(c) in a bench trial after he waived a jury trial for each offense. The trial judge sentenced the appellant to a term of five years imprisonment on the cocaine charge which was to run concurrently with a three year sentence he imposed on the weapon offense.

In his appeal to the Fifth Court of Appeals the appellant claimed that the trial court had erred in overruling his motion to suppress. The appellate court rejected his appeal and affirmed his conviction. *Crosby v. State*, 696 S.W.2d 388 (Tex.App.—Dallas 1985, pet. granted).

This Court granted the appellant's petition for discretionary review to determine whether the Court of Appeals' conclusion that the search of appellant's dressing room and seizure of items therein, and the later seizure of the weapon was lawful under the Fourth and Fourteenth Amendments to the United States Constitution, and Article I, § 9 of the Texas State Constitution.

The appellant, a well-known nightclub and recording entertainer, had contracted with Cardi's, a Dallas night club, to perform on the night of April 12, 1982. The record established that Cardi's was a club licensed to sell alcoholic beverages by the Texas Alcohol Beverage Commission. Further, the contract between appellant and Cardi's provided that appellant was to be furnished with a private dressing room secluded from the general public.

The evidence also showed that between 11:45 p.m. on April 12, 1982 and midnight Dallas police officers received a call that a man was refusing to leave the Medallion Shopping Center, which is in the immediate vicinity of Cardi's. Two police officers, Officers Rinebarger and Holly, responded to the call; however, they shortly thereafter received instructions to disregard the call because other police units had sufficiently covered the situation. Notwithstanding, Rinebarger and Officer Holly decided to proceed to Cardi's as a backup unit. Upon arriving at the night club the

officers discovered that the other police units had indeed resolved any problem which may have existed outside Cardi's. Nevertheless, Rinebarger and Holly decided to enter Cardi's to conduct a "routine investigation, inspection for liquor violations," presumably pursuant to T.A.B.C. § 101.04.

After entering Cardi's and inspecting the customer area of the premises and during an intermission, Officer Rinebarger stepped upon the stage and approached an adjacent room, whose entrance was covered by a drawn opaque curtain. As Rinebarger made his approach to this entrance he was intercepted by a man who placed his fist in Rinebarger's chest and said "you can't go in there." Rinebarger responded by pushing the man aside and walking around him, pulling the curtain back and entering the dressing room. Upon entering the dressing room he observed several people seated on a couch and the appellant crouched on the floor with a propane torch in one hand and a glass pipe in the other. Rinebarger also testified that he then noticed an unzipped athletic bag on appellant's lap, and when he [Rinebarger] looked inside the unzipped bag he saw a baggie which contained a white powdery substance which he had reason to believe was cocaine.[1] Rinebarger arrested the appellant, zipped and confiscated the athletic bag, seized the torch and pipe and transported the appellant to the Dallas City Hall. While on the elevator riding up to the jail Rinebarger believed the seized athletic bag felt unusually heavy, whereupon he searched it and found a .45 Colt automatic pistol. This was the basis of the weapon offense.

In its published opinion the Court of Appeals in essence concluded that the appel-

lant's pre-trial motion to suppress was properly denied because the appellant did not have a reasonable expectation of privacy in the curtained area that Officer Rinebarger entered. Consequently, according to the Court of Appeals' opinion, the officer's search was not in violation of the Fourth and Fourteenth Amendments to the United States Constitution, or Article I, § 9 of the Texas Constitution.

In his first two grounds for review the appellant obviously contends that the Court of Appeals' conclusion that he had no expectation of privacy in his dressing room is erroneous. He further contends that the search was not authorized by the Texas Alcoholic Beverage Code.[2]

According to the Court of Appeals plurality opinion, the tenor of appellant's position is "[t]hat the room in which he was arrested was 'his enclosed, private dressing room,' and that the owner of the club had given him 'exclusive use of the dressing room.'" *Crosby v. State, Id.* at 390. On this basis, appellant contends that officer Rinebarger's action in entering his dressing room was beyond the scope of the inspection authorized by T.A.B.C. § 101.04 and in the absence of a search warrant, consent, or probable cause the search was unreasonable under the Fourth Amendment to the United States Constitution and Article 1, § 9 of the Texas Constitution." *Crosby v. State, Id.* In other words, the appellant's complaint is that notwithstanding T.A.B.C. § 101.04,[3] he still had a reasonable expectation of privacy in the dressing room which was the subject of Rinebarger's search, and that the seizure of the weapon became the tainted fruit of the unlawful search.

1. The possession of cocaine offense was based on the cocaine discovered in the glass pipe. Whereas, the State's expert witness testified that when she analyzed the white powdery substance discovered in the athletic bag "there were no controlled substances detected." On cross-examination she testified that she did not identify the white powdery substance.

2. It should be noted that appellant does not claim that any part of the Texas Alcoholic Beverage Code, specifically § 101.04, is facially or

as applied herein unconstitutional under either the federal or state constitutions.

3. T.A.B.C. § 101.04 states as follows:
 By Accepting a license or permit, the holder consents that the commission, an authorized representative, or a peace officer may enter the premises at any time to conduct an investigation or inspect the premises for the purpose of performing any duty imposed by this code.

In addressing these assertions the Court of Appeals concluded that T.A.B.C. § 101.04 authorized administrative inspections on premises that sell alcohol beverages. Further, that officer Rinebarger was performing a duty imposed by the code as T.A.B.C. § 104.01(9) provides that no licensee may possess a narcotic or any equipment used or designed for the administering of a narcotic "nor may he permit a person on the premises to do so." The Court then pointed out that T.A.B.C. § 11.49(b)(1) provided the only means by which the license holder could exclude any portion of a licensed premises was to comply with T.A.B.C. § 11.49(b)(1),[4] and the record was devoid of any facts which demonstrated that the dressing room utilized by appellant was designated to be excluded from the licensed premises.

Accordingly, the Court of Appeals decided that in light of T.A.B.C. §§ 101.04 and 109.53,[5] the dressing room in question was under the exclusive occupancy and control of Cardi's which it could not surrender to appellant.

Furthermore, by accepting its permit Cardi's consented to police officers conducting an inspection of the licensed premises which included the appellant's dressing room. T.A.B.C. § 101.04. The Court of Appeals further noted that although Cardi's was to provide appellant with a private dressing room away from the public the General Manager and Manager of Cardi's testified that there was no intent to prevent any peace officer from performing any duty relative to the Texas Alcohol Beverage Code. The Court then concluded that "any rights of privacy asserted by appellant must have derived from Cardi's. Consequently, these rights are subject to the same strictures as Cardi's, pursuant to the terms of the Texas Alcoholic Beverage Code. We hold that appellant's expectation of privacy was neither reasonable nor legitimate." *Crosby v. State, supra* at 391. So, since Rinebarger had the right to be in appellant's dressing room under the Texas Alcoholic Beverage Code he had the right to view all matters in "plain view" therefore the subsequent seizures were valid.

To buttress its holding the Court relied on *Clark v. State*, 445 S.W.2d 516 (Tex.Cr. App.1969). In *Clark*, a Dallas police officer conducted a search for stolen goods which were secreted in a room with a locked door and the officer had to force open the door. The room in question was located in a licensed liquor store operated by the defendant. The officer retrieved the stolen goods and explained that his sole purpose for making the search was to recover the stolen property.

By relying upon the identified provisions of the Alcoholic Beverage Code and *Clark v. State, Id.*, the Court of Appeals implicitly held that Officer Rinebarger's search of the dressing room constituted a valid warrantless administrative search which does

---

**4.** T.A.B.C. § 11.49(b)(1) provides:

*Subject to the approval of the commission or the administrator,* and except as provided in Subsection (c) of this section, an applicant for a permit or license may designate a portion of the grounds, building, vehicles, and appurtenances to be excluded from the licensed premises. If such a designation has been made and approved as to the holder of a license or permit authorizing the sale of alcoholic beverages at retail or as to a private club registration permit, the sharing of space, employees, business facilities, and services with another business entity (including the permittee's lessor, which, if a corporation, may be a domestic or foreign corporation, but excluding a business entity holding any type of winery permit, a manufacturer's license, or a general, local, or branch distributor's license), does not constitute a subterfuge or surrender of exclusive control in violation of section 109.53 of this code or the use or display of the license for the benefit of another in violation of subdivision (15) of Subsection (a) of Section 61.71 of this code. This subsection shall not apply to original or renewal package store permits, wine only package store permits, local distributor's permits, or any type of wholesales's permits. [emphasis added].

**5.** T.A.B.C. § 109.53 reads in pertinent part:

Every permittee shall have and maintain exclusive occupancy and control of the entire licensed premises in every phase of the storage, distribution, possession, and transportation and sale of all alcoholic beverages purchased, stored, or sold on the licensed premises. Any device, scheme, or plan which surrenders control of the employees, premises or business of the permittee to persons other than the permittee shall be unlawful.

not require the necessity of probable cause or the formalities of procuring a search warrant.

■ In reaching its decision the Court of Appeals also focused its inquiry on the rights, duties, and obligations of a licensee of the Alcohol Beverage Commission, and what was required of the licensee if he is to retain a reasonable expectation of privacy in any portion of the premises. Such an approach may have correctly analyzed any reasonable expectation of privacy a licensee can expect under the statutory scheme set out in the Texas Alcoholic Beverage Code, but it cannot be dispositive of all third persons who are legally on the premises, such as appellant, a contract entertainer.

■ Thus, suspending for the moment the impact the Texas Alcoholic Beverage Code may have in this matter, the initial issue that must be resolved is whether the appellant had a reasonable expectation of privacy in the curtained room. Very recently, in *Chapa v. State,* 729 S.W.2d 723 (Tex.Cr.App.1987), this Court held that a "passenger qua passenger," *Id.* at 725, in a taxicab had a legitimate expectation of privacy in the area under the front seat of the taxicab Judge Clinton, writing for the Court, enunciated the appropriate standard for making the determination as to whether an individual has a reasonable or legitimate expectation of privacy:

> In *Rakas v. Illinois,* supra [439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)], the substantive question of what constitutes a "search" for purposes of the Fourth Amendment was effectively merged with what had been a procedural question of "standing" to challenge such a search. It became a matter, not only of whether some "reasonable," "justifiable" or "legitimate expectation of privacy" in a particular place exists, which has been breached by governmental action, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979), but also who reasonably, justifiably or legitimately harbored that expectation.

> *The litmus for determining existence of a legitimate expectation of privacy as to a particular accused is twofold: first, did he exhibit by his conduct "an actual (subjective) expectation of privacy[;]" and second, if he did, was that subjective expectation "one that society is prepared to recognize as 'reasonable.'"* Smith v. Maryland, 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226–27. *Id.* at 727. [emphasis added].

Focusing on the first part of the analysis we must make the determination as to whether appellant exhibited by his conduct "an actual (subjective) expectation of privacy". *Id.* The record clearly establishes that Cardi's was contractually obligated to provide appellant with a dressing room in a specific area of the club, to be set aside for his personal use. According to the record, this dressing room was located to the side of the stage and the entrance demarcated by the use of a curtain, which when drawn completely shielded anyone from viewing the inside of the room. In addition to contracting with Cardi's for this dressing room, the appellant took the precaution of placing a sentry in front of the drawn curtain, whose obvious duties entailed excluding unwanted intruders from invading the confines of the dressing area, albeit in the case of Officer Rinebarger unsuccessfully. Rinebarger was himself told by the individual posted outside the drawn curtain that he could not go into the room, although Rinebarger chose to ignore these instructions, the intent was to exclude Rinebarger from entering. Rinebarger acknowledged that he could not see into the dressing room until he pushed aside the posted guard, drew back the curtain, and entered the room.

Thus, although Cardi's failed to comply with T.A.B.C. § 11.49(b)(1) and exclude the dressing room from the dictates of T.A.B.C. § 101.04, at least from the standpoint of appellant, it is clear that his conduct manifested a subjective expectation of privacy.

The State contends and the Court of Appeals agreed that the Texas Alcoholic Beverage Code and its relationship to Cardi's effectively nullified the appellant's expecta-

tion of privacy in the dressing room, assuming he had one in the first place.

In general, statutorily authorized administrative inspections of businesses is an activity that is commonplace in our society. The constitutional acceptability of such regulatory inspections are to a great extent dependent upon both the scope of the inspection and the type of business being subjected to the inspection. For example, in *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), the Supreme Court condemned the warrantless fire inspection of the defendant's commercial warehouse by stating a "businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Id.* at 543, 87 S.Ct. at 1739. The court tempered this remark with the following cautionary comment:

> We do not in any way imply that business premises may not reasonably be inspected in many more situations than private homes, nor do we question such accepted regulatory techniques as licensing programs which requires inspections prior to operating a business or marketing a product. Any constitutional challenge to such programs can only be resolved, as many have been in the past, on a case-by-case basis under the general Fourth Amendment standard of reasonableness. *Id.* at 545, 546, 87 S.Ct. at 1740, 1741.

█ The latter comment was utilized three years later in *Colonnade Catering Corp. v. U.S.*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) when the Court ruled that the warrant requirement announced in *See v. City of Seattle, supra*, was not applicable to an inspection of the premises of a liquor licensee.[6] At the foundation of the Court's decision was the observation that the liquor industry has been "long

subject to close supervision and inspection." *Id.* 90 S.Ct. at 777. Accordingly, the Court agreed with the government "that Congress has broad power to design such powers of inspection under the liquor laws as it deems necessary to meet the evils at hand." *Id.* at 777. Therefore, at least implicitly, the regulation and inspection of businesses dealing in liquor is not subject to the same constitutional restraints that would be applicable to less regulated businesses. In other words, the owner of a closely regulated industry, such as that involving liquor, is considered to have a reduced expectation of privacy in the premises.[7]

█ Cardi's, similar to the business involved in *Colonnade Catering Corp. v. U.S., supra*, was engaged in a pervasively regulated business: the retail sale of alcoholic beverages. Therefore, the club was subject to the rules and regulations as set out in the Texas Alcoholic Beverage Code. We again note that appellant does not challenge that the relevant code provisions are facially unconstitutional under the Fourth and Fourteenth Amendments to the United States Constitution or under Article I, § 9 of the Texas Constitution, nor will we attempt to make such a determination. However, in view of the fact that the State seeks to justify the search on the basis of the Texas Alcoholic Beverage Code, the relevant guidelines which developed as a result of *Colonnade Catering Corp. v. U.S., supra*, are certainly essential to a consideration of appellant's claim that Rinebarger's search was beyond the legitimate scope of any inspection allowed by T.A.B.C. § 101.04.

In *New York v. Burger*, 482 U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) the Supreme Court again reviewed the expectation of privacy interests an owner of a closely regulated industry has in his premises. In this case, the Court was confront-

---

6. Although the Supreme Court found the search was not violative of the Fourth Amendment it reversed because the relevant statutory provisions did not provide for forcible entry into the locked storeroom. The only remedy provided was a fine for refusing government agents entry.

7. See also *U.S. v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); Cf. *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

ed with a statutorily authorized warrantless search of an automobile junkyard that resulted in the discovery of several stolen vehicles and parts. The owner was arrested and charged with possession of stolen property. The New York Court of Appeals concluded that the evidence discovered during the search should be suppressed because the " 'administrative scheme' here ... do[es] little more than authorize general searches...." *Id.*, 107 S.Ct. at 2641.

In reversing the New York Court of Appeals' opinion the Supreme Court observed that because the "owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy [in his premises], the warrant and probable-cause [sic] requirements, ... have lessened application in this context." *Id.* The Court continued, however, by observing that even this statutorily authorized reduced expectation of privacy "will be deemed to be reasonable only so long as three criteria are met." *Id.* at 2644. The three criteria are as follows:

1. First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made.

. . . . .

2. Second, the warrantless inspections must be "necessary to further [the] regulatory scheme."

. . . . .

3. Finally, 'the Statute's inspection program, in terms of certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' Ibid. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the officers.... [Citations omitted]. To perform this function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for spe-

cific purposes...." [Citations omitted]. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place and scope...." [Citations omitted]. *Id.*

We find that a substantial government interest is advanced by T.A.B.C. § 101.04 and that the inspections are necessary to the regulation of the liquor industry. Thus, the first two criteria are met. The third standard, as detailed by the Supreme Court, cannot be so easily and conclusively resolved.

■ Relative to the third criteria, it must be observed at the outset that in order for the regulatory statute to be an "adequate substitute for a warrant," *Id.*, it must meet escalating standards. Initially, the statute has to be sufficient in its content to give the owner of the regulated business notice that the search is authorized by law. Further, the statute must detail the scope of the search. Also, and of particular significance, the statute "must limit the discretion of the officers." *Id.* Focusing on the latter consideration, the Supreme Court emphasized the acceptability of provisions restricting the discretion of the State's agents is judged by whether the otherwise authorized search is "limited in time, place and scope." *Id.*

T.A.B.C. § 101.04 in essence grants to certain identified State agents, including a peace officer, the authority to enter a licensed premise "at any time," *Id.*, and "conduct an investigation or inspect the premises for the purpose of performing any duty imposed by this code." *Id.*

■ Disregarding the unrestricted time an inspection may occur and the rather expansive definition of the place that is subject to an inspection (see T.A.B.C. § 11.49), it is apparent that an authorized entry onto licensed premises and the concomitant inspection or search is expressly limited to a peace officer performing any duty imposed on the agent by the Texas Alcoholic Beverage Code.

The general duty of a peace officer under the Texas Alcoholic Beverage Code is

detailed under T.A.B.C. § 101.07. That section provides as follows:

all peace officers in the state, including those of cities, counties, and state, shall enforce the provisions of this code and cooperate with and assist the commission in detecting violations and apprehending offenders.

Therefore, consistent with the third criteria announced by the Supreme Court in *New York v. Burger, supra*, the regulatory scheme which authorizes warrantless inspections by peace officers is limited in its scope. The "scope" of the search must be "for the purpose of performing any duty imposed by the code," T.A.B.C. § 101.04, and the duties "imposed by the code," *Id.*, are as noted above.

■ Turning to the facts of the present case, the record reflects that initially Rinebarger indicated that his purpose in entering Cardi's was to inspect for liquor law violations. That may have been true, but that was not why he entered the appellant's dressing room. The record reveals the following exchange took place on cross-examination at the motion to suppress hearing:

(By Mr. Ethington [Defense Attorney]):

Q. Tell the Court, please, why you went around him, everything you can remember about why.

A. It raised my curiosity as to why he [the black man guarding the door] didn't want me to go in there.

Q. You were curious then?

A. Yes, sir.

Q. Can you give us any other indications other than curiosity over and above him saying you can't go in there?

A. Being that I was in uniform I felt like there might be a law of the State of Texas being violated inside that curtain.

Q. Based on you being a police officer and him saying you can't go in there?

A. Yes, sir.

Q. It raised your curiosity?

A. Yes, sir.

Q. Is there any other thing that you can articulate for us that entered into that decision for you to go on in, anything at all?

A. No, sir.

Q. Is it fair to characterize, officer Rinebarger, that you had a hunch or a strong hunch that you ought to go in there and investigate?

A. I felt like I should go through there, yes, sir.

Q. And it was a hunch; is that correct?

A. Call it what you want.

Q. Rather than me calling it, let's have you call it whatever you want.

A. I got curious as to whether there was a law being violated or not in there, so I walked in [the dressing room].

Q. You won't call it a hunch?

A. You can call it a hunch if you want to. I got curious.

Q. Well, if I call it a hunch would that be accurate?

A. I guess.

\* \* \* \* \* \*

From the above colloquy it is apparent that Rinebarger was not seeking to investigate for the detection of any violation of any provision of the Texas Alcoholic Beverage Code. The officer merely wanted to go where he had been told he could not, because his curiosity had been aroused when appellant's sentry informed him that he could not enter the dressing room. The statute which authorizes administrative searches or inspections must be conducted so as to "further the regulatory scheme ...," *New York v. Burger, supra*. The statute cannot be utilized to search licensed premises because one is curious as to what is going on behind a curtain or because as Rinebarger stated, he "felt like there might be a law of the State of Texas being violated inside that curtain." If we were to judge this record in a contrary fashion we would be providing peace officers of this state with the power and authority to conduct general, exploratory searches. This we will not, nor can we constitutionally, do.

To this extent we believe that Presiding Judge Onion's dissent in *Clark v. State, supra,* is applicable and instructive. As previously noted, in *Clark* a majority of this Court made the determination that the search of a locked room in a liquor store to look for stolen property was proper under Article 666–13(d), V.A.P.C., which was the predecessor of T.A.B.C. § 101.04, and very similar in nature. In voicing his vigorous dissent Judge Onion noted:

I fully agree that the acceptance of a license or permit under the Texas Liquor Control Act is an implied consent to such inspection and visitorial examination as is required for the purpose of enforcing that act and is implied waiver of the constitutional immunity to that extent, *but to that extent only.* [emphasis added].

. . . . .

In *Brown* [*v. State,* 391 S.W.2d 425 (Tex.Cr.App.1965)], it is observed that to reach the desired effect the opinion quotes Article 666–13(d) out of context. The majority in the case at bar utilizes the same approach in its final conclusion that the acceptance of liquor or permit constitutes an intelligent, voluntary and knowing waiver of the constitutional right against all unreasonable searches and seizures, at any time of the day or night, whether related to regulation of the liquor law or not.... In my humble opinion the majority paints with too broad a brush in its decision of waiver.

It appears to be the majority's position that a licensee or permittee relinquishes certain constitutional guarantees and agrees to submit to all police searches even though not essential to the purpose of the Texas Liquor Control Act, and that the scope of the authority of the searching officer is not limited. The majority thus grants to all peace officers a blank form of general warrant to search all licensed premises at any time *under any circumstances* eliminating the necessity of ever obtaining in advance judicial approval of searches and seizures through the warrant procedure. *Id.* at 522–523.

Judge Onion's insight is appropriate to the situation at hand, even assuming, arguendo, the Court of Appeals was correct in its supposition that any right of privacy Crosby possessed derived directly from Cardi's (which will be hereafter discussed). By accepting the liquor license Cardi's only relinquished its constitutional protections to the extent that any search pursuant to the Texas Alcoholic Beverage Code was conducted for the purpose of enforcing that Act.

We find that from the record that Officer Rinebarger acted beyond the scope of T.A.B.C. § 101.04, as the search of Crosby's dressing room was not related to detecting a violation of the Texas Alcoholic Beverage Code, rather Rinebarger attempted to use the Code as a subterfuge to conduct a exploratory search. The propriety and necessity of our conclusion is made even more apparent in the following analogy.

T.A.B.C. § 101.04, taken in conjunction with T.A.B.C. § 11.49(b)(1) permits an inspection, or search of all grounds, buildings, vehicles, and appurtenances not excluded from the licensed premises. In *Buchanan v. State,* 471 S.W.2d 401 (Tex.Cr.App.1971) this Court held that a person inside a toilet stall in a public rest room which was provided with stall doors that locked "could be said to have some reasonable expectation of privacy[,]" as "[t]he occupants are entitled to the modicum of privacy its design affords." *Id.* at 404. Could an individual on Cardi's premises be subjected to a peace officer's exploratory search while he was using the public accommodations and inside the locked toilet stall? Such a proposition is untenable notwithstanding the language of the regulatory statute.

Based upon the foregoing we find that because the inspection was not in the furtherance of the regulatory scheme of the Texas Alcoholic Beverage Code it could not have affected the appellant's expectation of privacy.

To the extent that *Clark, supra,* stands for the proposition that peace officers searching and inspecting pursuant of T.A.B.C. § 101.04, have unbridled discretion to

search without regard to the intended purpose of the regulatory statute it is overruled.

■ We now turn to the second consideration: is the expectation of privacy one that society is prepared to recognize as reasonable?

In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court stated:

Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or *to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others*, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses *or controls* property will in all likelihood have a legitimate expectation of privacy by virtue of the *right to exclude.* [emphasis added].

In the case at bar the appellant had contracted for a private dressing room which Cardi's agreed and did provide. It was shielded from public view by a closed curtain, and appellant took the additional step of placing his own private sentry outside the curtain in an attempt to keep unwanted intruders from entering the dressing room. From viewing the facts of this case it is a reasonable conclusion that appellant at least possessed and had the power to exercise a significant degree of control over the dressing room and to exclude unwanted intruders and members of the general public from that area. As Justice Howell observed in his dissenting opinion:

In the writer's view, there are a number of entertainers and performers who travel from city to city for the purposes of appearing in bars, lounges, and night clubs. Every entertainer needs a dressing room, not only for clothing and make-up purposes, but so that they might have a few moments of relaxation away from the eyes of the public and demands of the audience. *Crosby v. State, supra* (J. Howell dissenting).

Appellant was entitled "to the modicum of privacy ..." *Buchanan v. State, supra,* the dressing room and its design afforded. Appellant manifested his subjective expectation that at the very minimum his dressing room was to provide him the privacy in a secluded area with the concomitant right to exclude interlopers from the area. We believe that in light of contemporary societal standards society is prepared to recognize appellant's subjective expectation of privacy as both "reasonable" and "justifiable" considering of the facts of this particular case.

■ The foregoing analysis and comments are predicated upon the Court of Appeals' conclusion that the appellant's expectation of privacy was derived from Cardi's, the licensee under the Texas Alcoholic Beverage Code. Beyond that, there is another reason to find that the appellant has a reasonable expectation of privacy in the dressing room. As Justice Howell also noted in his dissent: "The user of the licensed premises, whether he be entertainer, employee, patron, casual visitor, or whoever, stands in an entirely different posture than the actual licensee." *Crosby v. State, supra* at 400. Thus, a determination as to whether the user of the licensed premises has an actual reasonable expectation of privacy and whether society recognizes such expectation as reasonable must be analyzed independently from the actual license holder.

The Supreme Court has not hesitated to hold that although a broad state statutory authority to search individuals exists, such authority cannot be used to abrogate the Fourth Amendment. In *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), a search warrant was issued to search the premises of a tavern and the person of the bartender. While executing the warrant the police officers announced their purpose and commenced a "cursory search for weapons" of the patrons. Ultimately one of the officers discovered a cigarette pack on Ybarra's person which contained heroin. One of the grounds which the State of Illinois relied upon to justify the search was a state statute which

authorized officers "... to detain and search any person found on the premises being searched pursuant to a search warrant, to protect themselves from attack or to prevent the disposal or concealment of anything described in the warrant". *Id.* at 89, 100 S.Ct. at 341. The Supreme Court held the requirements of the Fourth Amendment were not dispensed with because of the Illinois statute, rather the statute had no effect until and unless the officers "... validly entertain[ed] an articulable reason to believe that another person present but not named in the warrant possesse[d] weapons or contraband." *Id.* In addition, the Court pointed out that probable cause to search the bar and the bartender did not also mean probable cause to search all patrons. In analyzing a patron's Fourth Amendment rights on the tavern premises the Supreme Court observed:

It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. But a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons not places.

Each patron who walked into the Aurora Tap Tavern ... was clothed with constitutional protection against an unreasonable search or seizure. That individual protection was separate and distinct from the protection possessed by the proprietor of the tavern or by "Greg." Although the search warrant, issued upon probable cause, gave the officers authority to search the premises and to search "Greg," *it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers. Id.* at 91–92, 100 S.Ct. at 342–343 [citations and footnotes omitted]. (Emphasis added).

The distinction between *Ybarra* and the present situation is that *Ybarra* dealt with the actual search of a person and here we are concerned with not a search of appellant's person but the search of the area where appellant was located and had exhibited "an actual (subjective) expectation of privacy ...," *Smith v. Maryland,* 442 U.S. 736 at 740, 99 S.Ct. 2577 at 2580, 61 L.Ed. 2d 220 at 227 (1979), that we have found "society is prepared to recognize as reasonable." *Id.*

■ To a large degree the determination as to whether a individual has a reasonable expectation of privacy depends upon the location or situs of that individual at the time of the questioned search. As was stated in *Liebman v. State* 652 S.W.2d 942, 945 (Tex.Cr.App.1983):

While the design of the "place" in which appellants were observed by the officers is important, see *Green [v. State,* 566 S.W.2d 578 (Tex.Cr.App. 1978)], supra; *Buchanan v. State,* 471 S.W.2d 401 (Tex.Cr.App.1971), its relevance is in reflecting the inherent opportunity the individual had for privacy in the "place" and the steps he actually took to avail himself of that opportunity.

"But [an] effort to decide whether or not a given 'area,' viewed in the abstract is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people not places. * * * [And what a person] seeks to preserve as private in an area accessible to the public, may be constitutionally protected."

Thus, if the appellant was in such a "place" which reflected an inherent opportunity for privacy and he took actual steps to avail himself of that opportunity it would follow that his individual subjective expectation of privacy is "one society is prepared to recognize as 'reasonable,' " *Chapa v. State, supra* and would be sepa-

rate and distinct from any constitutional protections which Cardi's may or may not have had under the circumstances.

 The State's basic contention is that because of T.A.B.C. § 101.04, provided for warrantless inspections to facilitate the detection of liquor law violations the appellant was simply in a "place" which could not afford him an inherent opportunity for privacy as "[a]ny rights of privacy asserted by [Crosby] must have derived from Cardi's[,]" notwithstanding his subjective expectation of privacy, and because of the statute society would be unwilling recognize Crosby's expectation as "reasonable". We do not disagree entirely with the State's position. However, as we have noted, the expectation of privacy that Cardi's abandoned when it accepted a license under the Texas Alcoholic Beverage Code and thus authorized warrantless inspections of the premises was abandoned only insofar as it related to furtherance of the regulatory scheme detailed by the Texas Alcoholic Beverage Code. Cardi's did not by accepting a liquor license waive all of its rights under the Fourth Amendment. Consequently, with this modification, the State's position and the Court of Appeals' conclusion is correct: the appellant derived his expectation of privacy from Cardi's. But, that expectation of privacy was waived by Cardi's only for investigations performed pursuant to the regulations of the industry. We recognize that the liquor industry is a closely regulated industry and as to the owner of the commercial premises a warrant is not a condition precedent to valid search conducted within the scope of and made pursuant to the statute; however, we are not prepared to accept the notion that someone with a legitimate expectation of privacy on such premises is not protected by the Fourth Amendment or Article I, § 9 of the Texas Constitution. See: *State v. Williams*, 84 N.J. 217, 417 A.2d 1046 (1980).

 Based on the preceding analysis, we find that Officer Rinebarger exceeded the scope of a legitimate search pursuant to T.A.B.C. § 101.04, and the Court of Appeals erred in its conclusion that Cardi's consented vicariously to an exploratory search of the appellant's dressing room by accepting a liquor license. See *Poindexter v. State*, 545 S.W.2d 798 (Tex.Cr.App. 1977) [8]

We therefore hold that the search of appellant's dressing room was in violation of the Fourth and Fourteenth Amendment to the United States Constitution and Art. I, § 9 of the Texas Constitution.

 Having determined that the entry and search of the appellant's dressing room and his arrest was illegal it is necessary to determine whether the "fruit of the poisonous tree doctrine," originally set forth in *Silverthorne v. U.S.*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and restated in *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), is applicable. Under the "fruit of the poisonous tree doctrine" evidence derived indirectly from a Fourth Amendment violation is excluded as trial evidence. However, not all indirectly acquired evidence must be suppressed. Essentially, assuming that a Fourth Amendment violation did occur, the only indirectly acquired evidence that should be suppressed is that which was acquired by an exploitation of the unconstitutional intrusion. In other words, even assuming that the acquisition of the indirectly acquired evidence was illegal it should not be excluded if it was obtained independent of the initial illegality. *Wong Sun v. U.S., supra; Gonzalez v. State*, 588 S.W.2d 355 (Tex.Cr.App.1979). In summary, if there are satisfactory intervening events that attenuate the taint of the initial illegality then the indirectly obtained evidence will usually be deemed admissible. *Miller v. State*, 736 S.W.2d 643 (Opinion on Appellant's Motion for Rehearing) (Tex.Cr. App.1987).

8. In *Poindexter, supra*, this Court declared Art. 725(b), § 15, V.A.P.C. overbroad under *Colonnade, supra*, the statute allowed employees or officers of the Department of Public Safety and *all* peace officers to inspect the premises of pharmacies, but did not provide the authority to search without a warrant and did not specifically authorize inspection of records and files. In the case *sub judice* by analogy, Rhinebarger's action was not authorized by *statute*.

In the present case no such intervening events are present. The appellant was illegally arrested and immediately transported to the police station where his bag was searched and the gun was seized. Whether Rinebarger's search of the bag is characterized as an inventory or something else is irrelevant. What is relevant is that "[b]ecause the arrest was illegal, any evidence derived from the arrest would 'absorb the taint' of that illegality...." *Hill v. State*, 692 S.W.2d 716, 722 (Tex.Cr.App. 1985). Therefore, the appellant's Motion to Suppress the gun should have been granted. See also: *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).

Accordingly, the judgments of the Court of Appeals are reversed and the causes remanded to the trial court.

ONION, P.J., and DAVIS and WHITE, JJ., dissent.

MILLER, Judge, concurring.

The majority opinion is correct with regard to the reasonableness of appellant's expectation of privacy. I do not agree with the Court of Appeals' holding that appellant's expectation of privacy in his dressing room derived from and must be measured by the expectation of privacy held by the licensee-owner in the entire business establishment. Neither do I agree with the implied finding by the majority that had the police officer gone into appellant's dressing room in furtherance of the regulatory scheme detailed by the Texas Alcoholic Beverage Code, he would have been within the scope of a permissible regulatory search.

The Fourth Amendment to the United States Constitution and Article 1, § 9 of the Texas Constitution guarantee persons freedom from unreasonable searches. This right, as noted by the majority, protects the " 'legitimate expectations of privacy' of persons not places." At 779, citing *Ybarra v. Illinois*, 444 U.S. 85, 91–92, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979), *rehearing denied*, 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 737 (1980).

Certainly a licensee-owner may be required to waive some privacy rights in exchange for the privilege of engaging in a closely regulated business. See *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) and *Collonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). There is no requirement, however, that employees, patrons, or other persons must also waive their rights upon entry into the business establishment. See at 778, discussing *Ybarra*, supra.

Thus, I see no reason why any expectation of privacy held by appellant regarding the dressing room should be considered waived because the owner-licensee waived his rights to privacy. Rather, we should determine: 1) whether appellant exhibited an expectation of privacy in the dressing room, and 2) whether that expectation was reasonable in the face of a regulatory scheme that calls for exploratory administrative searches in the club that housed the dressing room.

With regard to the first inquiry, I find that the facts of this case support a finding that appellant manifested an expectation of privacy in the dressing room. The record shows that:

1. appellant had a contract with the club which provided that he was to be furnished with a private room;
2. the dressing room was separated from the public area of the club, and was curtained from public view;
3. a bodyguard was posted outside the room to prevent unauthorized entry; and
4. appellant was present and using the room at the time of the search.

Clearly appellant exhibited an expectation of privacy in what he considered and what was meant to be his private dressing room.

I also would hold that this expectation of privacy was reasonable given a regulatory scheme that authorizes exploratory administrative searches of the club that housed the dressing room, for the following reasons.

First, a dressing room is not an area used to further the conduct sought to be regulated by the T.A.B.C. since no liquor is sold there, nor are customers allowed

there. An entertainer's backstage dressing room has long been accepted in this country. By its very title, the dressing room is a room for changing clothes or costumes. The privacy that society places on this routine occurrence is high, as evidenced by the large number of private places within public places that exist solely for the purpose of removing clothing (clothing store changing rooms, swimsuit bathhouses, health spa locker rooms, etc.)

Second, there is no evidence that the dressing room here was anything but that: an entertainer's legitimate dressing room as opposed to a sham or subterfuge.

Last, as pointed out in Justice Howell's dissent, a dressing room is historically and traditionally regarded as a private area for the entertainer and has been considered so since the time of Thespis.

In this regard, the dressing room is not unlike a restroom provided in a nightclub. Certainly a third person visiting or working in such an establishment would have a right to privacy in a closed stall in the restroom, which most persons would assume. This Court would likely find that expectation reasonable in the face of a forced police entry into a closed and occupied stall under the guise of "furtherance" of a regulatory scheme. I see little reason to distinguish between these areas within the nightclub vis-a-vis the right to privacy.

In sum, the dressing room should not have been searched because appellant exhibited an expectation of privacy in that area which I believe was reasonable under the circumstances. Thus, the search was beyond the scope of that authorized by the T.A.B.C. The majority opinion should recognize this analysis of the *reasonable* expectation of privacy appellant had with regard to the dressing room, independent of any rights waived by the owner-licensee.

With these comments, I join the remainder of the majority opinion and, under the facts of this case, the result reached.

TEAGUE and CAMPBELL, JJ., join.

McCORMICK, Judge, dissenting.

The majority today carves out an exception in the law which can apply only to big name entertainers. Such preferential treatment reduces the Fourth Amendment to nothing more than hollow words and demeans all our rights to equality under the law. Not only does the record before us fail to demonstrate any reasonable expectation of privacy in the defendant, the majority opinion destroys the entire spirit of the regulatory function of the Alcoholic Beverage Code. To such preferential and distorted application of the law, I most vigorously dissent.