**AFFIRM; and Opinion Filed July 14, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-15-00770-CR

### RONTAE J-R THORNTON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 380th Judicial District Court
Collin County, Texas
Trial Court Cause No. 380-81318-2015**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Lang-Miers

Appellant Rontae J-R Thornton was charged by indictment with continuous sexual abuse of a child, sexual assault of a child, and possession/promotion of child pornography. Appellant filed a motion to suppress, which the trial court denied. Appellant then pleaded guilty to all three charges. The trial court sentenced appellant to forty years' imprisonment for continuous sexual abuse of a child, ten years' imprisonment for sexual assault of a child, and ten years' imprisonment for possession/promotion of child pornography. The sentences run concurrently. In two issues on appeal, appellant argues that the trial court erred in denying his motion to suppress. Because all dispositive issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.2(a), 47.4. We affirm.

BACKGROUND

Prior to the hearing on appellant's motion to suppress, the jury heard testimony by Sergeant Joseph Spano of the McKinney Police Department and viewed a video of appellant's traffic stop and subsequent detention. Sergeant Spano testified that, around 2:30 a.m. on March 12, 2014, he was watching a Motel 6 in McKinney, Texas, for suspicious activity related to illegal narcotics. He saw two people leave Motel 6, get in a car, and drive out of the parking lot. After following the car, Spano pulled the driver over for two traffic violations: veering into the lane with oncoming traffic and not stopping completely at a stop sign. The video showed that Spano approached the passenger-side window, explained that he pulled appellant over for a traffic violation, and asked for appellant's address, which appellant provided. Appellant stated that the car was his mother's and was registered in her name. Spano then asked the female passenger for her name, and she responded that her name was B.J.[1] Spano testified that nothing indicated that appellant was under the influence of alcohol or drugs or that "any drug activity" was occurring and the female passenger did not appear to be in distress or disheveled.

Spano returned to his police car with the driver's license for the driver and "ran both subjects on [his] in-car computer for NCIC status and a warrant check." Through the computer search, he determined that appellant had a valid driver's license, there were no warrants for his arrest, the vehicle registration and insurance were valid, and the car was not stolen. He identified the driver as Rontae Thornton, who was born in 1976. The video showed that, as Spano finished the computer search in his police car, he stated to himself, "Got some protective orders out." Spano testified that he did not recall who was protected by the protective order, but he was "concerned that [B.J.] might be one of the protected people[.]" He also stated that the passenger "looked young." He testified that, because juveniles do not have identification, "they're hard to

---

[1] B.J. stated her full first and last name to Spano.

identify" and "it's easy to lie about the name, birthdate." He testified that he returned to the vehicle because he "was suspicious" and "wanted to verify what kind of relationship there was."

He went to the passenger-side window of appellant's car and asked B.J. if she had a Texas driver's license or identification card. She replied that she did not. He asked her to spell her name and provide her birthday, which she said was in 1999. Spano testified that he thought the disparity in age was "odd" and that the difference in their last names "was an issue." Spano requested that she get out of the vehicle so that he could talk with her separately.

Spano then asked her, "Who is he to you?" She replied, "He's my stepdad." She said that they were coming from his house because her mom needed medicine and he needed something for a headache. She also stated, "We live with him." But, when Spano questioned B.J. about the inconsistent street addresses that she provided to Spano, she then said that she did not know where appellant lives. She stated that they had not stopped anywhere else. Spano then asked appellant, "Who is she to you?" He replied that she was a friend of the family. He stated that he was coming from "the house," saw her walking, and told her that he would give her a ride wherever she needed to go and that he was going to CVS. Appellant stated that they had not come from anywhere else. Spano testified that "the fact that there was[sic] inconsistent stories about their relationship was a red flag for me." He also knew that appellant was lying when he said that he had not stopped anywhere after picking B.J. up because he had just seen them leave Motel 6.

Spano kept appellant and B.J. separated to "try to discern what was really going on" and "[t]here continued to be inconsistent statements" and the "stories continued to change[.]" He testified that the "two stories never matched ever." B.J. stated that her mother, Jennifer,[2] was dating appellant and knew B.J. was with him. She stated that she did not know her mother's

---

[2] B.J. gave Spano her mother's first and last name.

phone number because "she just got it changed." Appellant at first replied that he did not know where B.J. "was staying[,]" but then stated that she lived with her grandmother. He stated that B.J. was friends with his niece, he had a girlfriend named Savannah, and that he lived with his grandmother, his mother, and his nieces, and not with his girlfriend. When confronted about the differences in their stories, B.J. said that appellant was lying about living with his grandmother. After Spano told her that appellant said that he had picked her up while she was walking, she said that appellant picked her up while she was walking near Motel 6. But appellant had stated that he picked her up at a different location. Spano then told appellant that his story did not match B.J.'s story that he was her stepfather. Appellant replied that she could call him that because he had dated her mother for two years and known B.J. since she was seven years old.

After Spano told appellant that he saw them come from Motel 6, appellant said that he saw B.J. at Motel 6. He said that he did not have a room at Motel 6 and did not rent one for her, but he was planning on renting a room that night. But, when asked again, appellant stated that he had rented a room. Spano then told B.J. that appellant told him that he had rented a room at Motel 6. She stated that she called him to pick her up at her house and appellant already had rented a room that day. She stated that appellant said that he had to go get something, so they went up to the room where they talked, and then they went to CVS to get menstrual supplies. She stated that appellant was going to take her home that night and her grandmother knew that she was with appellant and staying in a room with him.

Spano and appellant discussed the motel room:

Spano: No drugs in the room though, right?

Appellant: No drugs, Bro.

Spano: Alright. I just need to make sure that, like, be released to like a safe environment so like before like, since she's safe and [] with you, I'm good with it but like you know motels, man, you know how motels.

–4–

Appellant: If y'all want to go look and see.

Spano: Is that cool with you?

Appellant: I mean, there's no.

Spano: What room is it?

Appellant: It's 303.

Spano: You have the key, you say?

Appellant: Yeah, I've got the key. I mean ain't no drugs in there, man, you know.

Spano: Okay. Do you mind if we look?

Appellant: What? In the room?

Spano: Um, hmm.

Appellant: I mean, nah. I mean, ain't got nothing to hide in there. I mean, like I said, you know, I've been in the room but, you know, ain't no drugs in there, man.

Spano: So, so that's what I'm saying. So, can we look so I can make sure so I can get this little girl back to you so that you can get her to her grandmother's?

Appellant: Yeah. I mean, you want to go and look?

Spano: Yes.

Appellant: Yeah. Here are [sic] the key right here.

Spano: Is that cool? Well, you've got to come with me.

Appellant: Oh, okay. Just come on in.

Spano: Well, let me hang on. 303, Motel 6, right?

Appellant: Yeah.

The police drove there in their vehicles and B.J. rode with one of them. Appellant drove alone in the car he was driving. Once they all arrived at Motel 6 and before appellant and Spano entered the room, the following additional exchange occurred:

Spano: Rontae.

–5–

Appellant: Yes, sir.

Spano: All right man, just—just so we're on the same, on the same part: you are giving me—going in the room and searching and make sure ain't no drugs or anything crazy, right?

Appellant: Yeah, man. I'm telling you man. Boss, I'm not gonna lie to you man.

Spano: All right. But you know I've got to ask that . . . , right?

Appellant: Yeah, I'm cool with that.

Spano searched the room. He testified that the room "had been stayed in": the "bed was unmade" and "unless someone is a fitful sleeper, indicated there was some activity occurring in the bed." He testified that the pillows were propped up, which was "a tell tale sign that two people laid in that bed together" "at least in close proximity or in contact with one another." Spano testified that, because the bed was "in disarray" and there was a white handtowel on the bed, it indicated that "sexual activity" had occurred. There was a heavy perfume scent of incense, although appellant stated that the incense was there before he arrived in the room. In addition, a feminine hygiene pad was in a trash can next to the bed, which indicated to Spano that the person who removed it disposed of it in the common area of the room and not in the bathroom. He assumed that this meant that the person removed the pad "during the course of sexual foreplay[.]" Spano also testified that he found no sexual implements or devices.

After searching the room, Spano questioned B.J. further. She stated that she had a boyfriend and that appellant had always been there for her, "nothing else." She repeatedly denied that she had a sexual relationship with appellant, said that she did not do that "sex stuff," and stated that kissing was "gross." Spano commented to her that her feminine hygiene pad was in the trash can by the bed, not in the trash can in the bathroom. B.J. said that she put her pad in the trash can in the bathroom, and that appellant got the trash can from the bathroom to dispose of the burning incense.

When Spano returned to the room, he read appellant his Miranda rights.[3]  He questioned appellant about whether he and B.J. were having a sexual relationship.  Appellant replied that "it ain't nothing like that" and that he had gotten the room for himself.  Appellant initially said that, when the two were in the room together, appellant was in the bed and B.J. sat on the end.  Appellant said "we were chilling" in the room for about two hours but that they did not have any sexual contact.

Spano and appellant sat on opposite sides of a small table in the motel room and appellant had his phone in his hand.  Appellant was "manipulating his phone, texting" and Spano could not see what he was doing with his phone.  Spano testified, "Because any electronic evidence is immediately trouble.  So I didn't want him manipulating the phone, so I wanted him to put it down or to not look at it."  Spano and appellant then had the following exchange:

Spano: Is that your phone man?

Appellant: Yeah.

Spano: Can I look at it?  Do you have a call from her?  Don't delete nothing.  If I can't look at it, that's fine but just put it down.

Appellant: Okay.  I ain't get no call from nobody.

Spano: Did you call her?

Appellant: No, I ain't called nobody.

Spano: She said she—she said she called you to come pick her up, right?

Sergeant Spano testified that appellant gave him permission to look at the phone, "used the pass code to unlock it and handed it to" Spano.  Spano testified that he looked at the text message portion of the phone and saw various messages from "Savannah" from that night about sneaking out of the house and meeting.  He testified that "it was apparent to [him] that those

<hr />

[3] *See Miranda v. Arizona*, 384 U.S. 436, 467–73 (1966).

messages from Savannah were from the victim." Spano then looked at the photo gallery and "saw the victim in various stages of undress." Spano told appellant that he "had naked pictures of her in [his] phone" and appellant initially said it was not B.J. Spano testified that the subsequent investigation confirmed that the photos were of B.J. and were sent to appellant by B.J.

After Spano testified and the jury viewed the video of appellant's traffic stop and detention, the Court considered appellant's motion to suppress "[a]ny and all evidence collected subsequent to" the "detention of the Defendant by the police in this case as well as the search of his hotel room by the police[.]" Appellant claimed that the detention and search of the "hotel room" were "illegally prolonged and without lawful basis and therefore illegal." The court denied appellant's motion. The court found that "it was reasonable suspicion from the additional facts presented to the police officer for him to extend the stop[.]" Appellant then pleaded guilty to continuous sexual abuse of a child, sexual assault of a child, and possession/promotion of child pornography. The court sentenced appellant to imprisonment. This appeal followed.

## DETENTION

In his first issue, appellant argues that the trial court erred in denying his motion to suppress because police obtained the evidence from an illegal detention.

### Applicable Law and Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review a trial court's factual findings for an abuse of discretion, but we review de novo the application of law to those facts. *Id.* When the trial court makes no findings of historical facts, as in this case, we must view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit fact-findings that are supported by the record.

*Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). We will sustain the trial court's decision if we conclude that the decision is correct on any applicable theory of law. *Id.* at 662–63.

Under the Fourth Amendment, a warrantless detention of a person that is less than a full-blown custodial arrest must be justified by reasonable suspicion. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). A police officer has reasonable suspicion to detain a person if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the detained person is, has been, or soon will be engaged in criminal activity. *Id.*; *see Terry v. Ohio*, 392 U.S. 1, 20–21 (1968). The standard looks to whether there was "an objectively justifiable basis for the detention" and "disregards the actual subjective intent of the arresting officer[.]" *Derichsweiler*, 348 S.W.3d at 914. The standard also looks to the totality of the circumstances: "[t]hose circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id.* "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Id.* (quoting *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997)).

### Arguments of the Parties

Appellant argues that the trial court erred in denying his motion to suppress because police obtained the evidence when they illegally detained him "beyond a completed traffic stop without reasonable suspicion."[4] He contends that the police began investigating appellant's relationship to B.J. after police concluded the traffic stop and determined that no narcotics were present. In addition, appellant argues that the State did not establish that Sergeant Spano had

---

[4] Appellant does not challenge the initial detention for traffic violations.

reasonable suspicion to justify the continued detention. Appellant contends the police were unable to state "articulable facts showing unusual activity related both to the suspected individual and to criminal activity" to establish that Spano had reasonable suspicion. The State argues that the trial court properly denied appellant's motion to suppress because Spano's initial questioning was proper and Spano had reasonable suspicion to detain him.

**Analysis**

**1. Standard for Detention**

Appellant argues that police illegally extended his detention after police resolved the purpose of the traffic stop. "[A]n investigative stop can last no longer than necessary to effect the purpose of the stop." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004); *see Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997) ("[I]f reasonable suspicion exists, the detention must be temporary and last no longer than necessary to effectuate the purpose of the intrusion."). A routine traffic stop includes "the license and warrants check." *Kothe*, 152 S.W.3d at 63. "On a routine traffic stop, police officers may request certain information from a driver, such as a driver's license and car registration, and may conduct a computer check on that information." *Id.*; *see also id.* at 64 n.36 (citing *United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003), for the proposition that "[t]he detaining officer may also question the vehicle's occupants regarding their identities, travel plans, and ownership of the vehicle"). The traffic-stop investigation is fully resolved only after police complete this computer check and the officer knows that the driver has a currently valid license and no outstanding warrants and the car is not stolen. *Id.* at 63–64. "But if reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled." *St. George v. State*, 197

S.W.3d 806, 817 (Tex. App.—Fort Worth 2006), *aff'd*, 237 S.W.3d 720, 721 (Tex. Crim. App. 2007).

Appellant argues that Sergeant Spano completed both the traffic stop and his investigation as to whether appellant had narcotics before "shift[ing] his attention to B.J." and hearing the first of appellant's and B.J.'s inconsistent statements. He argues that "[n]othing *before* or *during* these investigations raised his suspicions." We disagree.

The evidence showed that Spano spoke with B.J. and asked her name when he first approached the vehicle. And while running "both subjects on [his] in-car computer for NCIC status and a warrant check[,]" Spano discovered that appellant had "some protective orders out." He stated that B.J. appeared young. And he was concerned that B.J. "might be one of the protected people" and it was difficult to confirm her identity because, as a juvenile, she did not have identification.[5] Spano testified that he was "suspicious" and returned to appellant's car to verify "what kind of relationship there was." As a result, the evidence shows that Spano began to investigate appellant's relationship with B.J. before the traffic stop was complete. *See Kothe*, 152 S.W.3d at 63–64, 64 n.36.

In addition, although appellant argues that Spano only "shifted his attention to B.J." after he had completed the traffic and drug investigations, Spano testified that he prolonged the detention because various factors made him suspicious that the two had an inappropriate relationship: the time of night, their age difference, the fact that they were leaving the motel parking lot, and the difference in their last names. Each of these circumstances he observed or ascertained prior to or during the traffic stop. *See St. George*, 197 S.W.3d at 817 (continued

---

[5] Appellant argues that "[w]ithout an allegation or probable cause that Appellant had violated a protective order, Sgt. Spano could not justify a detention based on the protective order." But Spano did not detain appellant to verify an allegation of a violation of a protective order nor did Spano arrest appellant without a warrant because he had probable cause to believe that appellant violated a protective order. Rather, the protective order that Spano saw when he conducted a computer search of appellant and a young female in the passenger seat of the car that appellant was driving were part of the "totality of circumstances" to justify an investigative detention. *Derichsweiler*, 348 S.W.3d at 914.

–11–

detention may be justified if reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled). We conclude that police did not illegally extend appellant's detention because reasonable suspicion arose in the course of the stop and before the purpose of the stop was fulfilled.

## 2. Standard for Reasonable Suspicion

Appellant argues that, even if Sergeant Spano "had become personally suspicious during the traffic stop, he never had sufficient articulable facts to support reasonable suspicion." The State argues that Spano had reasonable suspicion to prolong the detention after the traffic stop and to continue the detention based on various articulable facts. The State contends that these articulable facts gave rise to reasonable suspicion to continue the investigation to ensure that B.J. was not a runaway and that appellant and B.J. did not have an inappropriate relationship.

Appellant argues that, when Spano "initially extended the detention," the only articulable facts that he had were his "visual estimation of B.J.'s age," their leaving the motel together, the time of night, and their different last names. Appellant argues that Spano admitted that two of these facts—the time of day and a man driving with someone younger—were not unusual. But the record reflects that Spano stated that a "grown man" riding "around with a kid in their car" was "not illegal" and that "[g]rown men are allowed to have kids in their car at 2:30 in the morning[.]" He did not testify that these facts were not unusual. Appellant also argues that "there is nothing unusual about a driver and passenger with different last names leaving a hotel together." And, citing *Derichsweiler*, 348 S.W.3d at 916, appellant argues that, even if this was unusual, "Spano was unable to connect" these circumstances "to criminal activity" in order to "support reasonable suspicion." But the *Derichsweiler* court stated that the reasonable suspicion standard looks to the totality of the circumstances which "may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an

–12–

investigative detention is justified." *Id.* at 914. "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Id.* (quoting *Woods*, 956 S.W.2d at 38). Likewise, to "support a reasonable suspicion, the articulable facts must show 'that some activity out of the ordinary has occurred, some suggestion to connect the detainee to the unusual activity, and *some indication that the unusual activity is related to crime.*" *Id.* at 916 (quoting *Meeks v. State*, 653 S.W.2d 6, 12 (Tex. Crim. App. 1983) (emphasis added)).

Spano testified that, when he went back to his car to run a status and warrant check on appellant and B.J., he was suspicious based on various facts: "Just the large disparity in age. It's 2:30 in the morning, leaving the motel room. They don't have the same last names. And one is a juvenile and one is an adult male." Spano testified that these facts gave him "reasonable suspicion that something was out of the ordinary, something was going on[.]" Spano also testified that the "active protective orders in place" also served as "information to justify the prolonged detention[.]" He testified:

> I had her step away from the vehicle simply because the time that I—where I saw them come from is very unique. There's—nothing indicated to me that they were related by last name. So all of those factors taken in totality, before I release them to go, the young female at this time of night, I just wanted to get her out of the vehicle and say, hey, who is he to you? She told me it's her stepfather. He had a completely different answer. Had that not been the case, we would have been done.

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the evidence established that there were sufficient specific and articulable facts to support reasonable suspicion because, in combination, they "reasonably suggest the imminence of criminal conduct[.]" *See Derichsweiler*, 348 S.W.3d at 914.

Citing *Wade v. State*, 422 S.W.3d 661, 670 (Tex. Crim. App. 2013), appellant also argues that Spano did not identify anything "to distinguish Appellant's behavior from that of innocent

–13–

people under the same circumstances, so as to set Appellant apart from them." *See id.* ("[T]he totality of the suspicious circumstances that an officer relies on 'must be sufficiently distinguishable from that of innocent people under the same circumstances as to clearly, if not conclusively, set the suspect apart from them.'") (quoting *Crockett v. State*, 803 S.W.2d 308, 311 (Tex. Crim. App. 1991)). In *Wade*, the court concluded that circumstances of "unordinary nervousness[,]" appellant's "changing story" explaining his location and activity, and refusal to cooperate did not give rise to reasonable suspicion. *Id.* at 670–76. The court concluded, "We cannot see how appellant's explanations could transform the objectively innocent activity of sitting in a work truck at a public boat ramp during the lunch hour into conduct giving rise to a reasonable suspicion of criminal activity." *Id.* at 671. But the present case is different because the articulable facts do not indicate an "objectively innocent activity": appellant and a much younger female with a different last name departed a motel at 2:30 a.m., appellant had an active protective order, and the officer was unable to confirm the female's identity because she lacked identification, gave different home addresses, and did not know her mother's phone number.

Appellant argues that Spano incorrectly contended that "the circumstances gave him enough justification to 'ask a single question'" and argues that the standard is not whether he had sufficient articulable facts to justify asking a single question but rather whether he had sufficient articulable facts to establish reasonable suspicion in order to detain appellant. Yet, although Spano referred to the circumstances justifying his "ask[ing] a single question about who is that to you[,]" there is nothing in the record indicating that the court denied the motion to suppress based on this standard. Instead, when the court denied the motion to suppress, the court concluded that "it was reasonable suspicion from the additional facts presented to the police

officer for him to extend the stop"—not that he had reasonable suspicion to justify asking a single question.[6]

Appellant also contends that the State cannot establish reasonable suspicion based on facts that the police subsequently discovered and, instead, the State must offer articulable facts that gave rise to reasonable suspicion at the time of the detention. *See Brown v. State*, 481 S.W.2d 106, 112 (Tex. Crim. App. 1972) ("[A] search cannot be justified by what it uncovers."). But based on our view of the evidence in the light most favorable to the trial court's ruling and our assumption that the trial court made implicit fact-findings that are supported by the record, *Arguellez*, 409 S.W.3d at 662, we conclude that the record supports the State's position that Spano had specific, articulable facts when he first extended the detention and throughout the detention.[7]

In addition, appellant argues that, instead of verifying whether the identification information that B.J. provided was correct, Spano continued to rely on "apparent inconsistencies for the next hour" to justify the detention. *See U.S. v. Sharpe*, 470 U.S. 675, 686 (1985) (stating appropriate to consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly" to determine whether a detention was too

---

[6] In addition, appellant argues that Spano admitted that appellant and B.J.'s conflicting accounts of their relationship "were not evidence of criminal activity" and argues that, as a result, the conflicting accounts "could not justify reasonable suspicion" to extend the detention. The record does not reflect that Spano made that admission. Rather, in answer to defense counsel's questions, Spano testified:

> A. I never got a consistent story. The stories never matched. The constant lying. Nothing has dispelled my—everything has continued to raise it.
>
> Q. What are the lies that are criminal in nature?
>
> A. I don't know that there's any criminal lie, if that's what you're saying.

In addition, appellant contends that B.J. and appellant explained the inconsistency in their stories regarding their relationship. Although appellant stated that she could call him her stepfather because he dated her mother and had known her since she was seven, there are numerous other inconsistencies between appellant's and B.J.'s stories, including where they lived and who they lived with, where he picked her up that night, where they had been, why they were going to CVS, whether appellant had a room at Motel 6, and whether they had been in the room.

[7] Appellant relies on *Richardson v. State*, No. 10-14-00217-CR, 2015 WL 4381333, at *3 (Tex. App.—Waco July 9, 2015, no pet.). *Richardson* is distinguishable. In *Richardson*, at the time the traffic stop investigation was fully resolved, reasonable suspicion did not exist because of a source's unreliability and because the police officer "only had a hunch that an illegal drug deal had occurred" and had not seen "affirmative actions between two people" thought to be involved in an illegal drug deal. 2015 WL 4381333, at *3. In addition, Richardson's suspicious behavior occurred after the purpose of the traffic stop concluded. *Id.* at *3. Here, Spano developed concern and suspicions during the traffic stop and there was no clear demarcation between the investigation for the stop and development of reasonable suspicion.

–15–

long); *see also Davis*, 947 S.W.2d at 243 (stating "that once the reason for the stop has been satisfied, the stop may not be used as a 'fishing expedition for unrelated criminal activity'") (quoting *Ohio v. Robinette*, 519 U.S. 33, 41 (1996)). But although B.J. gave Spano her name, she did not show him any identification and gave him different home addresses. And B.J. gave him her mother's name but B.J. did not know her mother's phone number because "she just got it changed." We agree with the State that Sergeant Spano could not have investigated to confirm or dispel his suspicions at that stage without more information.

Viewing the evidence in the light most favorable to the trial court's ruling and assuming that the trial court made implicit fact-findings that are supported by the record, *Arguellez*, 409 S.W.3d at 662, we conclude that the trial court did not err in finding that, under the totality of the circumstances, Spano had specific, articulable facts to give rise to reasonable suspicion to extend the detention.[8] We overrule appellant's first issue.

## CONSENT

In his second issue, appellant argues that the trial court erred in denying his motion to suppress evidence derived from the search of the motel room and his cell phone because his consent to search was coerced and he consented while he was illegally detained.

### Applicable Law

Consent to search is an established exception to the constitutional requirement that police have a search warrant. *See State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997). The Fourth and Fourteenth Amendments to the United States Constitution "require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Meekins v. State*, 340 S.W.3d 454, 458–59 (Tex. Crim. App. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S.

---

[8] Because we conclude that Spano did not illegally prolong the detention and had reasonable suspicion to extend the detention, we do not address appellant's other arguments that no other legal theory justified the detention.

218, 228 (1973)). Whether a person's consent is voluntary is a question of fact that is determined by analyzing the totality of the circumstances of a particular situation. *Id.* at 459. "The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent search was voluntary or coerced." *Id.*

The standard for measuring the scope of consent under the Fourth Amendment is that of "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "[C]ourts review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Id.* The ultimate question is whether the person's "'will ha[s] been overborne and his capacity for self-determination critically impaired,' such that his consent to search must have been involuntary." *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). The State must prove the voluntariness of a consent to search by clear and convincing evidence. *Id.*

Issues of consent are "necessarily fact intensive" and, as a result, "a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous." *Id.* at 460. The prevailing party in the trial court "is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)). When the trial court does not submit findings explaining the factual basis for its decision, we imply findings of fact that support the ruling so long as the evidence supports those implied findings. *Id.*

**Motel Room Search**

**Arguments of the Parties**

Appellant argues that Spano coerced appellant into allowing the room search and that the search was unlawful because his detention was illegal. We have already concluded that his detention was lawful. As a result, we only address whether his consent to search was coerced. Appellant argues that Spano "conspired with fellow officers to figure out a way to coerce Appellant into allowing them into the hotel room" and his "consent" was only acquiescence to police authority or was coercion by the implied threat that he would continue to be detained unless he agreed to the search.[9] The State argues that the search of the room was reasonable because he consented. The State contends that appellant spontaneously offered to allow Spano to search the room rather than "merely acquiescing" to a request by police or being forced by police coercion. The State also argues that the interactions between appellant and Spano demonstrate that appellant's consent was voluntary. The State argues that Spano's interactions with appellant were polite and conversational and Spano "never forced or ordered Appellant to do anything."

We agree with the State that appellant voluntarily gave Spano consent to search the motel room. We may consider factors in determining whether an individual's consent was voluntary such as physical mistreatment, use of or threats of violence, inducements or promises, and trickery or deception. *Meekins*, 340 S.W.3d at 460 n.26. None of these factors existed here. We may also consider the mental and physical condition and capacity of the defendant, *id.*, any constitutional advice given to the defendant, the repetitiveness of the questioning, and the length

---

[9] Appellant also argues that Spano never informed appellant of his right to refuse the search, even though Spano's police department "maintained consent forms to inform suspects of this right." As appellant notes, whether the police warn a person of the right to refuse a search is "not conclusive" but "evidence of consent." *See Johnson v. State*, 68 S.W.3d 644, 653 (Tex. Crim. App. 2002) ("Although a police officer's failure to inform the accused that he can refuse consent is a factor to consider, the absence of such information does not automatically render the accused's consent involuntary."); *Meeks v. State*, 692 S.W.2d 504, 510 (Tex. Crim. App. 1985). As discussed, the record contains other evidence of consent that we conclude shows that the trial court's finding of consent was not clearly erroneous.

of the detention. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). "An officer's request for consent to search does not taint an otherwise consensual encounter as long as the police do not convey a message that compliance with their request is required." *Meekins*, 340 S.W.3d at 460 n.26 (quoting *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998)).

Here, Spano asked appellant if there were drugs in the room and appellant stated that there were not. Spano responded that he "just need[ed] to make sure that" B.J. would "be released to" "a safe environment" and, although she was safe with appellant, "you know motels[.]" Appellant then offered, "If y'all want to go look and see." Spano responded, "Is that cool with you?" Then after discussing the room number and the room key, Spano asked, "Do you mind if we look?" And appellant responded, "I mean, nah. I mean, ain't got nothing to hide in there." Spano then asked, "So, can we look so I can make sure so I can get this little girl back to you so that you can get her to her grandmother's?" And appellant responded, "Yeah. I mean, you want to go and look?" and "Yeah. Here are [sic] the key right here." Appellant then drove himself to the motel alone in his own vehicle. When they arrived at the motel, Sergeant Spano again confirmed with appellant that appellant was giving consent for Spano to go into the room and search to make sure there were no drugs. Throughout, Spano's tone was non-confrontational.

Appellant states that appellant had been detained for thirty minutes when he agreed to the room search and argues that police procured appellant's consent by implying that he would only be allowed to leave if he allowed them to search the room and they found no drugs. The record, however, reflects that the consent was voluntary and not the product of implied coercion. *See Cadoree v. State*, 331 S.W.3d 514, 520–21 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (concluding consent was voluntary where appellant had been patted down and placed in patrol car, but police officer was not threatening and did not draw his firearm but "merely inquired

–19–

whether there was anything in appellant's room that" the officer "'should know about,' to which appellant responded by giving [the officer] permission to search his room"). And although appellant argues that Spano admitted on the record that he asked appellant for permission to search the room, the record also reflects that Spano asked for permission after appellant already stated: "If y'all want to go and look and see."

Considering all of the circumstances and giving proper deference to the trial court's determination, we conclude the State proved by clear and convincing evidence that appellant consented to the search of the motel room. The portion of appellant's second issue concerning the search of the motel room is overruled.

### Phone Search

Appellant argues that police coerced him into allowing the search of his cell phone. The State argues that appellant has not preserved this complaint for appellate review because he did not raise it in the trial court.[10] In response, appellant argues that, because the detention and search were illegal, evidence from the subsequent cell phone search was "fruit[] of the poisonous tree."[11] *See Crosby v. State*, 750 S.W.2d 768, 780 (Tex. Crim. App. 1987) ("Under the 'fruit of the poisonous tree doctrine' evidence derived indirectly from a Fourth Amendment violation is excluded as trial evidence."). We have concluded the detention and search of the room were lawful, so this evidence does not constitute "fruit of the poisonous tree."

Additionally, in his motion to suppress, appellant complained that the "detention of the Defendant by the police in this case as well as the search of his hotel room by the police, was

---

[10] Because of our resolution of this issue, it is not necessary for us to consider the State's argument that, even if appellant preserved this complaint, appellant voluntarily consented to the search of his phone.

[11] Appellant also argues in response—without citing authority—that, because appellant changed his plea to guilty when the trial court denied his motion to suppress and, as a result, the guilt/innocence stage of the trial ended with his plea, the State did not have the opportunity to admit the cell phone. He argues that he "cannot fail to preserve that which was not admitted to begin with" and, as a result, he "can only object to the trial court's refusal to suppress beforehand." But, as discussed below, the relevant inquiry is whether appellant made the trial court aware of his complaint concerning the suppression of evidence from the search of his cell phone by a timely request, objection, or motion.

illegally prolonged and without lawful basis and therefore illegal" and, as a result, "[a]ny and all evidence collected subsequent to this detention and search was obtained illegally and in violation of the Fourth and Fourteenth Amendments to the United States Constitution[.]"  But his motion did not refer to the search of the cell phone.  And appellant did not orally argue about the legality of the cell phone search at the hearing on the motion to suppress.  As a result, appellant did not complain to the trial court by a timely request, objection, or motion that states the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint.  TEX. R. APP. P. 33.1(a); *see Cisneros v. State*, 290 S.W.3d 457, 462–63 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd) (challenge to search of cell phone preserved where appellant challenged legality of the cell phone search in motion to suppress although attorney did not argue legality of phone search at suppression hearing); *Chung v. State*, 475 S.W.3d 378, 385 (Tex. App.—Waco 2014, pet. ref'd) (concluding that complaint about legality of initial search of cell phone preserved where motion to suppress referred to items seized from appellant's phone, counsel made clear at hearing on motion her concern with initial search of phone, and counsel asked officer about his justification for initial phone search in bill of review); *see also Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) (concluding appellant waived error as a result of "Appellant's global statements in his pretrial motion to suppress" that "were not sufficiently specific" and because he did not state specific complaint at the suppression hearing).

We overrule that portion of appellant's second issue concerning the search of appellant's cell phone.

## CONCLUSION

We overrule appellant's two issues and affirm the trial court's judgment.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)

150770F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RONTAE J-R THORNTON, Appellant

No. 05-15-00770-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas
Trial Court Cause No. 380-81318-2015.
Opinion delivered by Justice Lang-Miers, Justices Francis and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 14th day of July, 2016.